**Radomir RADIC, Plaintiff–Appellant,**

v.

**CHICAGO TRANSIT AUTHORITY,
Defendant–Appellee.**

No. 95–2157.

United States Court of Appeals,
Seventh Circuit.

Argued Dec. 7, 1995.

Decided Jan. 4, 1996.

Kenneth N. Flaxman, Stacey L. Beckman, Chicago, IL, Jennifer Trofa (argued), Chicago, IL, for plaintiff-appellant.

Barry S. Alberts, Catherine Masters Epstein (argued), Patricia J. Thompson, Schiff, Hardin & Waite, Chicago, IL, for defendant-appellee.

Before LAY,* CUMMINGS, and DIANE P. WOOD, Circuit Judges.

DIANE P. WOOD, Circuit Judge.

For many years, Radomir Radic worked for the Chicago Transit Authority ("CTA") as a civil-structural design draftsman. Radic's job was to check dimensions in various "Flange Angle books," which contain specifications for flange angles for particular portions of the CTA's elevated train structure. Potential fabricators of replacement flange angles then used the books in the competitive bidding process.

In the course of his review of some of the Flange Angle books, Radic became deeply concerned about the accuracy of the listed dimensions—in one case, he found that more than 40% of those dimensions were wrong, and in another case he found nearly 80% of the dimensions were wrong. He reported these concerns to David Hillock, Manager of Facilities, Engineering, and Maintenance, on June 4, 1987. This report triggered a lengthy process of evaluation and debate

---

* The Honorable Donald P. Lay, of the United States Court of Appeals for the Eighth Circuit, sitting by designation.

among various CTA officials about the best way to construct the Flange Angle books.

In short, Radic believed that it was best to rely on original shop drawing measurements, with subsequent field review, while others preferred direct reliance on field-measurement of the parts to be replaced. Through most of 1987 and 1988, CTA officials debated the relative merits of the two approaches. At one point, CTA engaged the services of an engineering consultant, who prepared a comprehensive report (interviewing Radic among others), and the CTA adopted many of the consultant's recommendations. Nevertheless, Radic remained dissatisfied, expressing his views in a number of letters to officials both inside and outside CTA.

After the review process was completed, Radic continued to stress his disagreement with the outcome. He began to refuse to complete assigned tasks, and, not surprisingly, he began to receive unfavorable performance reviews. At one point in 1989, he wrote a lengthy letter to a group of public officials including President George Bush, Secretary of Transportation Samuel Skinner, Senators George Mitchell and Robert Dole, and Chicago Mayor Richard M. Daley, recounting the course of events. He also began missing work repeatedly. During 1989, he called in sick or failed to show up on 97 days.

The CTA appears to have displayed remarkable patience throughout this period. Nonetheless, the managers reached the end of their rope in December 1990. On December 3, 1990, Cheri Heramb, the Manager of the Capital Planning & Construction Administration, recommended that Radic be placed on the leave of absence status known as "Area 605." This is an administrative leave classification that permits the CTA to fill a specific budgeted position while its nominal holder is on long-term disability leave, so as to preserve that employee's benefits. Area 605 employees, however, do not have the right to be restored to their former position when they return to active service; the CTA instead attempts to put them in any appropriate vacant slot. In Radic's case, when he reported again for work on April 15, 1991, his old position had been filled, and CTA had no appropriate vacancy. The CTA continued to consider him for possible employment for nearly three years, until February 1994 when he was "administratively separated" from the agency.

In the meantime, on May 27, 1992, Radic brought this suit under 42 U.S.C. § 1983, naming only the CTA as defendant and claiming that the CTA had refused to allow him to return to work in retaliation for his exercise of his right to free speech. The district court granted CTA's motion for summary judgment, finding that there was no evidence that the CTA Board had a policy of terminating whistleblowers and that it could not be liable for actions of its employees under *Monell v. New York City Dept. of Social Serv.*, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). The court rejected Radic's claim that the CTA officials immediately responsible for his assignment to Area 605 and his eventual termination, Nuria Fernandez (Deputy Executive Director of Capital Planning & Construction Administration) and Cheri Heramb, were themselves the official policymakers for the CTA in this case, and thus that their actions sufficed to make the CTA itself liable under § 1983.

In this court, Radic argues that the district court erred in concluding that only a decision of the CTA Board would suffice to support the § 1983 suit against the CTA. But the district court recognized that either action by the Board or action by another decisionmaker with authority to establish official policy would be adequate. Here, it is plain that the Board itself was uninvolved in the actions at issue. Both the CTA and Radic agree that the Board took no actions relating to Radic's employment, that the Board had no express policy requiring termination of whistleblowers, and that the Board had no particular policy with respect to the use of "Area 605." Radic further concedes that this Court, in *McNabola v. Chicago Transit Authority*, 10 F.3d 501 (7th Cir.1993), approved a jury instruction that stated that "The Board of Directors of the Chicago Transit Authority is the final policymaking authority for establishing the employment practices of the Chicago Transit Authority." 10 F.3d at 510. Finally, both Radic and the CTA agree that

Fernandez and Heramb were the officials who took the actions about which he complains. The question is thus whether those officials were the kind of decisionmakers with final authority to establish CTA policy described in *City of St. Louis v. Praprotnik*, 485 U.S. 112, 123, 108 S.Ct. 915, 924, 99 L.Ed.2d 107 (1988), and *Pembaur v. City of Cincinnati*, 475 U.S. 469, 481, 106 S.Ct. 1292, 1299, 89 L.Ed.2d 452 (1986), whose actions can subject the CTA itself to § 1983 liability.

Under no view of the law could we find that Fernandez and Heramb (or either of them) were such decisionmakers. As all opinions in *Praprotnik* recognized, this is a question that depends on state law. See 485 U.S. at 124, 108 S.Ct. at 924–25 (opinion of O'Connor, J., stating that identification of policymaking officials is a question of state law); *id.* at 142–43, 106 S.Ct. at 933–34 (opinion of Brennan, J., indicating that state law is the appropriate starting point, and that evidence of a county's actual allocation of policymaking authority is also relevant). Section 27 of the Metropolitan Transit Authority Act, 70 ILCS 3605/27, authorizes the Board to appoint an Executive Director, who is responsible for the management of the business and properties of the CTA and its employees, "subject to the general control of the Board." Both Fernandez and Heramb reported, directly or indirectly, to the Executive Director. Thus, even assuming for the sake of argument that the CTA Board is not the only final decisionmaker, it is plain that Fernandez and Heramb did not qualify. As *McNabola* recognized, the CTA Board is the official policymaker for employment decisions. Radic needed to show that the Board somehow acted to confer policymaking authority on a particular official before his or her actions could be considered policy decisions. See *Auriemma v. Rice*, 957 F.2d 397, 399–400 (7th Cir.1992); *Greensboro Professional Fire Fighter's Ass'n, Local 3157 v. City of Greensboro*, 64 F.3d 962, 965–66 (4th Cir.1995). No such evidence was before the district court. In fact, if the decision to terminate Radic was based upon his complaints, rather than upon his insubordination, the decision would have violated explicit CTA policy. Under Illinois law, CTA officers and employees can be discharged only "for cause

which is detrimental to the service." 70 ILCS 3605/28.

The fundamental flaw in Radic's theory is its failure accurately to distinguish between authority to make administratively final decisions and authority to establish official municipal policy. Only the latter suffices for § 1983 liability under *Monell*, as the plurality opinion in *Pembaur* explained at greater length. See 475 U.S. at 483 n. 12, 106 S.Ct. at 1300 n. 12 (Brennan, J., plurality opinion); see also *Praprotnik*, 485 U.S. at 126, 108 S.Ct. at 926 (O'Connor, J., plurality opinion) ("[i]f the mere exercise of discretion by an employee could give rise to a constitutional violation, the result would be indistinguishable from *respondeat superior* liability"). Because we find for the reasons stated here that the district court correctly granted summary judgment for the CTA, we have no need to reach the alternative grounds on which the CTA has defended its action in this court.

The judgment of the district court is AFFIRMED.