# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 06-2368

_____

Kathy Davison,                              *
                                            *
    Appellant,                          *
                                            *
    v.                                  *      Appeal from the United States
                                            *      District Court for the
City of Minneapolis, Minnesota;             *      District of Minnesota.
Rocco Forte, in his individual and          *
official capacities,                        *
                                            *
    Appellees.                          *


_____

Submitted: January 12, 2007
    Filed: June 20, 2007 (Corrected: 06/26/2007)

_____

Before COLLOTON, BRIGHT, and GRUENDER, Circuit Judges.

_____

GRUENDER, Circuit Judge.

Kathy Davison appeals from the district court's grant of summary judgment in favor of Rocco Forte and the City of Minneapolis ("Appellees") on her claims of unlawful retaliation in violation of the First Amendment rights to freedom of speech and freedom of association. The district court found that she failed to present a prima facie case of retaliation. For the reasons discussed below, we affirm in part and reverse in part.

## I.    BACKGROUND

Viewed in the light most favorable to Kathy Davison, *see Hughes v. Stottlemyre*, 454 F.3d 791, 793 (8th Cir. 2006), the facts are as follows. Davison has been employed with the City of Minneapolis Fire Department ("the Fire Department") since 1986 and has held the rank of Captain since 1999. She has been a member of the International Association of Fire Fighters Local 82 ("the Union") throughout her employment, during which Rocco Forte served as the Chief of the Fire Department. During the spring and summer of 2002, in response to budget constraints, Chief Forte proposed a plan to close Ladders 7 and 8 and purchase several quints,[1] which necessitated laying off firefighters ("the Plan"). Captain Davison actively and publicly opposed the Plan and asserts that she repeatedly was denied promotion to the position of Arson Investigator in retaliation for her outspoken and public opposition.

Captain Davison became active in opposing the Plan beginning in the fall of 2002. On October 3, 2002, Captain Davison attended a public meeting, also attended by Chief Forte, and voiced her opposition to the Plan, specifically arguing that it would result in longer response times by the Fire Department. Union President Tom Thornberg provided evidence that Chief Forte approached him after the meeting and said, "You really need to get your board under control. Kathy and [her son] were at a neighborhood meeting." Union President Thornberg went on to explain that "Chief Forte was upset with the Union and in particular Captain Davison for her position against [the Plan] . . . . Chief Forte was visibly upset regarding the comments Captain Davison made at the meeting when he made this statement to me."

---

[1]"Ladder" refers to a ladder company, a group of firefighters that staff a ladder truck. A "quint," or quintuple combination pumper, is a fire service apparatus that serves the dual purpose of an engine and a ladder truck. The name refers to the five functions that a quint provides: pump, water tank, fire hose, aerial device and ground ladders.

On October 14, 2002, the Union created the Committee to Oppose the Closing of Ladders 7 and 8, and Union President Thornberg appointed Captain Davison as head of this committee. Among other projects associated with this new role, Captain Davison organized the creation and distribution of flyers criticizing the Plan. The flyers warned citizens that the Plan would "decrease the safety of our community and firefighters" and urged them to contact their local City Council member to express disapproval of the Plan. Chief Forte saw this flyer when it was brought into his office and assumed that the Union committee was responsible for its creation. News Channel 9 in Minneapolis interviewed, filmed and ran a story about Captain Davison and her flyer-distribution efforts.

The following month, Captain Davison attended another public meeting during which Chief Forte attempted to dispel accusations that response times for medical emergencies would increase as a result of the Plan by promising that he would station a Hennepin County ambulance to service the areas previously covered by Ladders 7 and 8. Captain Davison stood before the crowd and explained that Chief Forte did not have the authority to decide where ambulances are stationed. Hennepin County Commissioner Mark Stenglein, who was present at the meeting, then stood up and confirmed that Captain Davison was correct. Also in November, Captain Davison attended and spoke out against the Plan at two other public meetings, one of which Chief Forte attended. Her efforts against the Plan were also featured in the *Southwest Journal*, a local magazine.

At the same time, the Fire Department announced in October 2002 that it was soliciting candidates for the position of Arson Investigator. The City of Minneapolis's Human Resources Department ("Human Resources") follows a standard procedure for filling municipal positions, including those with the Fire Department.[2] The procedure

_____

[2]Human Resources, or personnel, is directed by the Civil Service Commission and the City Coordinator's office. *See* Minneapolis, Minn. Charter, ch. 19; 2 Minneapolis, Minn. Code of Ordinances, ch. 21. The procedure followed by Human

requires applicants first to complete a written pass/fail examination. Those who pass must then complete a scored practical examination covering hypothetical fire emergencies. The practical examination score is weighted as ninety percent of a candidate's final score, with seniority accounting for the remaining ten percent. Human Resources then ranks the candidates by their final scores and compiles them into a list of certified candidates. The names and scores of the top three certified candidates are forwarded to the Fire Department, which then interviews those three candidates. A three-member panel that consists of two fire chiefs and one human resources representative conducts the interviews.[3] Chief Forte is not on the interview panel. The panel grades the answers of the candidates and then forwards both the examination and interview scores to Chief Forte, who makes the ultimate decision on which candidate to select. According to his testimony, Chief Forte simply selects the candidate with the highest interview score "100% of the time."

For the Arson Investigator position, nine candidates passed the written examination and completed the scored practical examination. Human Resources certified Captain Davison as the candidate with the highest examination score. The panel interviewed the top three candidates: first-ranked Captain Davison, second-ranked Jennifer Cornell and third-ranked Tim Thomas. Thomas received the highest

---

Resources derives from the Civil Service Commission's authority under the Minneapolis Charter to standardize the process by which candidates are certified for municipal positions. *See* Minneapolis, Minn. Charter, ch. 19 § 7.

[3]The first and second interview panels for the Arson Investigator position included Assistant Chiefs Ulysses Seal and James Clack and Human Resources Generalist Lasamy Mila. For the third interview panel, Deputy Chief Dave Dewall replaced Assistant Chief Clack. Union official Thomas Griffin was also present during the panel interviews to read the questions, but he did not score the answers.

interview score of 87.66, while Cornell received a score of 87 and Captain Davison received a score of 84. Chief Forte did not select Thomas, the candidate with the highest interview score, but instead promoted Cornell.[4]

In February 2003, a second Arson Investigator position opened. Human Resources certified Captain Davison, Thomas and William Lindberg as the first-, second- and third-ranked candidates, respectively, based on their practical examination scores. Because the panel had just recently interviewed Captain Davison and Thomas, they only interviewed Lindberg. Lindberg scored an 82 on the interview, behind Thomas's 87.66 and Captain Davison's 84 from the prior round of interviews. This time Chief Forte did select the candidate with the highest interview score and promoted Thomas.

After the two failed promotion attempts, Captain Davison's public opposition to the Plan continued and increased. In March 2003, Captain Davison participated in a rally protesting the Plan and expressed her concerns to the City of Minneapolis Mayor R.T. Rybak, who is a member of the City Council's Executive Committee, the entity responsible for the appointment and removal of the Fire Chief. Minneapolis, Minn. Charter, ch. 3, § 4; ch. 4 § 4. That same month, Captain Davison's protest of the Plan at a City Council meeting attracted media attention. For example, the St. Paul newspaper, *Pioneer Press*, ran a story on the front page of its local news section that included several quotations and photographs of Captain Davison, and Minnesota Public Radio ("MPR") aired an interview with Captain Davison. Captain Davison

---

[4]The record reveals that on at least one other occasion Chief Forte did not follow his purported practice of selecting only those candidates with the highest interview score. In 1999, Human Resources certified firefighter Jeffrey Westall as the first-ranked candidate for the position of Captain. Twenty-three openings for the position of Captain were available and, following the Human Resources procedure, the Fire Department panel interviewed 25 candidates. Westall's interview score ranked him 24th out of the 25 interviewees. Nevertheless, Chief Forte selected him for promotion.

attended two more City Council meetings on April 1 and April 14, 2003, where she similarly spoke out against the Plan.

In the spring of 2003, Ladder 8 was closed pursuant to the Plan. Following a July 14, 2003 house fire during which civilian Pearl Gallagher died, News Channel 9 aired an interview with Captain Davison. In the story, Captain Davison attributed Gallagher's death to the Plan, arguing that if Ladder 8 had not been closed the Fire Department's response time would have been shorter and the likelihood of rescuing Gallagher would have been greater. Chief Forte discussed Captain Davison's allegations with Councilman Scott Benson, his staff and "who was ever [sic] up in the office at the time."

In its August 2003 edition, the community magazine *The Rake* featured a cover story about the Fire Department with the headline: "The Minneapolis Fire Department, now officially 'a recipe for disaster.'" The article covered the death of Gallagher and, in particular, speculated about how the closing of Ladder 8 may have contributed to her death. Also featured in the article were pictures of Chief Forte, Mayor Rybak and Union President Thornberg and excerpts from an interview with Chief Forte. The article quoted an unnamed firefighter who stated: "Four minutes less in that atmosphere, would [Gallagher's] chances be better? Yes." Chief Forte testified that Captain Davison was the only person, to his knowledge, that characterized Gallagher's death as a tragic consequence of the Plan and called the article "disheartening." Also that summer, Chief Forte held a meeting for the laid-off firefighters that Mayor Rybak, three City Council members and Captain Davison attended. The next day, the *Pioneer Press* published an article about the meeting and quoted Captain Davison's claim that the Plan was not actually addressing the budget constraints it was designed to alleviate.

In November 2003, a third Arson Investigator position opened. The Fire Department panel interviewed Captain Davison, Lindberg and Denise Bryn, whom

Human Resources certified as the first-, second- and third-ranked candidates, respectively. The interview panel scored Bryn highest with an 87, followed by Captain Davison with a 67 and Lindberg with a 43. Chief Forte promoted Bryn.

The record contains extensive facts regarding Chief Forte's knowledge of Captain Davison's media appearances. He specifically admitted to seeing the summer 2003 article in the *Pioneer Press* and the August 2003 article in *The Rake* and hearing about the MPR interview. He also knew that the local news programs ran "four or five" stories on the Union's opposition to the Plan and knew stories ran in the major local newspapers and in neighborhood magazines such as the *Southwest Journal*. Chief Forte also testified to the following facts: he and his Plan received a lot of negative media coverage; he would have discussions with Mayor Rybak as the media coverage occurred; he was disheartened by the negative media coverage; he was interviewed for many stories in the media coverage; he was aware that Captain Davison was quoted in many of the media stories; he believed Captain Davison was quoted in the media coverage more than anyone else; he thought of Captain Davison as the "face of the union"; he knew Captain Davison was vocal in her opposition to the Plan; and he frequently discussed the media coverage with people in his office. The record also reveals that Chief Forte was not happy about Captain Davison's outspoken opposition to the Plan and that Union opposition delayed its implementation.

Captain Davison filed this lawsuit against the City of Minneapolis and Chief Forte, in his individual and official capacities, alleging unlawful retaliation for engaging in speech and association activities protected by the First Amendment. After discovery, Appellees moved for summary judgment, which the district court granted. As to Chief Forte, the district court found that Captain Davison failed to demonstrate a causal connection between her protected activities and his decisions not to promote her. As to the City of Minneapolis, the district court found that Chief Forte did not have the policymaking authority necessary to subject the City of Minneapolis to

liability. Captain Davison appeals, arguing that the district court improperly weighed the evidence, which, when viewed in the light most favorable to her, demonstrates genuine issues of material fact that preclude summary judgment. Appellees respond that there is no evidence that Captain Davison's constitutionally protected activities were a motivating factor in the promotion decisions and, in any event, the same decisions would have been made even in the absence of the protected activities. Captain Davison also argues that Chief Forte had the authority necessary to subject the City of Minneapolis to liability, which Appellees deny.

## II.    DISCUSSION

We review the district court's denial of summary judgment de novo. *Hughes*, 454 F.3d at 796. "Summary judgment is proper where the evidence, when viewed in the light most favorable to the nonmoving party, indicates that no genuine issue of material fact exists and that the moving party is entitled to judgment as a matter of law." *Id.* (quoting *Spears v. Mo. Dep't of Corr. & Human Res.*, 210 F.3d 850, 853 (8th Cir. 2000)).

### A.    First Amendment Retaliation

To establish a prima facie case of retaliation, a plaintiff must allege and prove that: (1) she engaged in activity protected by the First Amendment; (2) the defendant took an adverse employment action against her; and (3) the protected conduct was a substantial or motivating factor in the defendant's decision to take the adverse employment action. *Mt. Healthy City Sch. Dist. v. Doyle*, 429 U.S. 274, 287 (1977). If the plaintiff meets this burden, the burden shifts to the defendant to demonstrate that

the same employment action would have been taken in the absence of the protected activity. *Mt. Healthy*, 429 U.S. at 287.[5]

[5]In our *Graning v. Sherburne County* decision, a First Amendment case, we explicitly stated that the *Mount Healthy* framework applies only where the plaintiff has presented direct evidence showing that the employer used the plaintiff's protected speech as a criterion in the employment decision. 172 F.3d 611, 615 n.3 (8th Cir. 1999). Two cases cited by the dissent likewise stated that the *Mount Healthy* framework applies only where there is direct evidence, but the claims in those cases were not brought under the First Amendment. *See Carroll v. U.S. Dep't of Labor*, 78 F.3d 352, 357 (8th Cir. 1996) (whistleblower claim under the Energy Reorganization Act); *Beshears v. Asbill*, 930 F.2d 1348, 1353 (8th Cir. 1991) (discrimination claim under the Age Discrimination in Employment Act). In contrast with *Graning*, other decisions of our circuit have employed the *Mount Healthy* framework in First Amendment cases without requiring that the plaintiff present direct evidence. *E.g., Altonen v. City of Minneapolis*, No. 06-3527, slip op. at 6 (8th Cir. June 4, 2007); *Calvit v. Minneapolis Pub. Sch.*, 122 F.3d 1112, 1116-17 (8th Cir. 1997); *Stever v. Indep. Sch. Dist.*, 943 F.2d 845, 849 (8th Cir. 1991).

When there are conflicting lines of cases within our circuit, we are free to choose which line to follow. *United States v. Maxon*, 339 F.3d 656, 659 (8th Cir. 2003). In this case, we choose to follow the line of cases that employ the *Mount Healthy* framework for retaliation claims under the First Amendment without requiring the presence of direct evidence for three reasons. First, the Supreme Court has never stated that First Amendment retaliation claims require so-called direct evidence in order for the *Mount Healthy* framework to apply. *See Mt. Healthy*, 429 U.S. at 287. Second, the majority of circuits to address this issue have decided that "the *Mt. Healthy* mixed-motive analysis applies to First Amendment claims, regardless of whether the plaintiff uses direct or circumstantial evidence to prove that there was a retaliatory motive behind the adverse employment action." *Allen v. Iranon*, 283 F.3d 1070, 1074-75 & n.4 (9th Cir. 2002) (collecting cases from the First, Second, Third, Fifth, Sixth, Seventh and Tenth Circuits, and noting that *Graning* is in conflict with these circuits). Third, Appellees have not urged this court and did not urge the district court to apply the *McDonnell Douglas* framework. In fact, both parties cited only *Mount Healthy* in their briefs in this proceeding and in the proceedings below. For these reasons, we respectfully disagree with the dissent's contention that the *McDonnell Douglas* framework should be applied, and we apply the *Mount Healthy* framework to Captain Davison's claim.

Typically, in determining whether speech is constitutionally protected, as a threshold matter we would first consider whether the employee spoke as a citizen and on a matter of public concern. *Garcetti v. Ceballos*, --- U.S. ---, 126 S. Ct. 1951, 1958 (2006). In the present case, however, Appellees did not challenge, either in their brief or at oral argument, the fact that Captain Davison engaged in the protected activities in her capacity as a citizen and that they involved a matter of public concern. With respect to establishing the prima facie case, Appellees do not challenge the facts that Captain Davison was engaged in conduct protected by the First Amendment, was qualified for the position of Arson Investigator and suffered adverse employment actions by being denied the promotion three times. Therefore, the only issue with respect to establishing the prima facie case is whether Captain Davison's protected association and speech activities were a substantial or motivating factor in the decisions not to promote her. *See Mt. Healthy*, 429 U.S. at 287. We believe Captain Davison presented sufficient evidence to create a genuine issue of material fact with respect to this element.

There is no dispute that Chief Forte was aware of Captain Davison's protected union and speech activities that were repeatedly critical of his Plan. Chief Forte was aware of her media appearances, referred to her as "the face of the union" and admitted that she appeared in the media more than any other firefighter. He also testified that Captain Davison was the only person to link the Plan to Gallagher's death, an allegation he was forced to discuss with the public and with Councilman Benson. Moreover, Chief Forte often discussed Captain Davison's media appearances with two members of the interview panel, Assistant Chiefs Seal and Clack. All three men testified that newspaper articles covering her activities "float[ed] around the office" and that they frequently discussed media coverage of the Union's opposition to the Plan.

Turning to whether Chief Forte's knowledge of her protected activities motivated his decisions not to promote Captain Davison, we find our *Hughes* case instructive. In *Hughes*, a sergeant with the state highway patrol brought a First

Amendment retaliation claim against his supervisor after he was demoted, allegedly for speaking out against changes to patrol policy. 454 F.3d at 793. Sergeant Hughes's direct supervisor, Lieutenant Ripley, supported a plan to consolidate his patrol group with that of a nearby county. *Id.* At a meeting where Lieutenant Ripley was present, Sergeant Hughes spoke out against the plan, citing statistics that tended to show that response times for troopers would increase, thereby adversely impacting public safety. *Id.* at 794. After the meeting, Lieutenant Ripley was visibly angry with Sergeant Hughes. *Id.* In the months following the meeting, Sergeant Hughes received verbal reprimands, negative performance evaluations and four disciplinary complaints from co-defendants, all of which were inconsistent with his performance and reviews prior to the meeting. *Id.* Sergeant Hughes was eventually demoted. *Id.* at 795. In holding that Sergeant Hughes presented evidence that his conduct was a substantial or motivating factor sufficient to satisfy the third element of the prima facie case, we relied on the facts that: "Ripley strongly favored the proposed consolidation plan" but was "forced to reconsider [it]" after Sergeant Hughes questioned its impact on public safety; "Ripley was visibly angry" after the meeting at which Sergeant Hughes spoke out against the plan; Lieutenant Ripley continued to voice dismay at Sergeant Hughes's opposition to the plan; and Hughes was "unwilling[ ] to accede to the plan." *Id.* at 798.

We believe that the facts put forth by Captain Davison are similar to those in *Hughes* and are likewise sufficient to create a genuine issue of material fact as to whether her activities were a motivating factor in the promotion decisions. *See id.* at 799. Captain Davison began engaging in constitutionally protected activities in October 2002. Chief Forte was unhappy with and disheartened by the public opposition to the Plan led by Captain Davison, whom he referred to as "the face of the Union." After one public meeting during which Captain Davison challenged the Plan's impact on public safety, Chief Forte got visibly upset by her remarks and verbally expressed his displeasure with her to Union President Thornberg, telling him to "get your board under control." As a result of Captain Davison's efforts, Chief Forte repeatedly had to address with the public, and once with Councilman Benson,

accusations about the Plan's impact on public safety and the likelihood of more deaths like Gallagher's. Evidence in the record also indicates that Captain Davison's relentless public opposition on behalf of the Union delayed implementation of Chief Forte's Plan. From all of this evidence, we believe a jury could infer that Chief Forte's repeated decisions not to promote Captain Davison were in part motivated by her constitutionally protected activities. *Id.* at 797 ("a plaintiff must prove an employer's retaliatory motive played *a part* in the adverse employment action") (emphasis added); *see also Campbell v. Ark. Dep't of Corr.*, 155 F.3d 950, 959-60 (8th Cir. 1998) (holding that "evidence that [the defendants] believed that [the plaintiff's] general outspokenness on security and corruption encouraged media criticism of [the defendants]" was sufficient for a jury to infer causation in the retaliation claim).

In addition, temporal proximity between protected activity and an adverse employment action can contribute to establishing the third element of a prima facie case of retaliation. In *Hudson v. Norris*, we held that the plaintiff's "exemplary" record in combination with the fact that the adverse employment action took place within four months of the protected conduct, was sufficient to allow "a reasonable jury to infer a causal link between [the two]." 227 F.3d at 1051, 1053. We stated that an adverse action that occurs on the heels of protected activity "is significant evidence that what happened . . . was more than just coincidence." *Id*. at 1051. Likewise, in *Stever v. Independent School District No. 625*, we stated that "the order and temporal proximity of [the challenged employment action and the protected activity] should not be regarded as coincidental on a motion for summary judgment." 943 F.2d 845, 852 (8th Cir. 1991).

Captain Davison's protected activities began in October 2002 and were ongoing through December 1, 2003, when she was denied for the third time the promotion to Arson Investigator. Her first promotion attempt was denied four months after Chief Forte told Union President Thornberg to get his board under control and after Captain Davison appeared on local news programs. It occurred three months after Captain

Davison publicly rebuked Chief Forte's claim of authority to decide where to station ambulances and when she appeared in a local newspaper attacking the Plan. The second promotion attempt was denied one month after the first. The third promotion was denied after Captain Davison's protected activities continued and increased. She had participated in a rally that was televised on the local news eight months before the third promotion attempt, and she publicly attributed Gallagher's death to Chief Forte's Plan just three months before she was denied the third promotion. Consistent with *Hudson* and *Stever*, the fact that the three denied promotions occurred while Captain Davison's protected activities were ongoing and continuous cannot be characterized as coincidental on this record. *See Hudson*, 227 F.3d at 1051; *Stever*, 943 F.2d at 852.[6]

In sum, we disagree with the district court and hold that the evidence of Chief Forte's knowledge of her protected activities and his expressed displeasure with them, in combination with the proximity of the three promotion denials, constitutes sufficient evidence to create a genuine issue of material fact as to whether the promotion decisions were at least in part motivated by Captain Davison's constitutionally protected activities.

With there being sufficient evidence for a jury to conclude that Captain Davison's protected activities were a motivating factor in Chief Forte's decisions not

---

[6]We do not mean to imply that simply engaging in protected conduct near the time of a promotion opportunity guarantees an employee a desired promotion. *See Wedow v. City of Kansas City*, 442 F.3d 661, 675 (8th Cir. 2006) (noting that "temporal proximity alone generally will not suffice to create a genuine issue of fact on a retaliation claim"); *see also Muldrew v. Anheuser-Busch Inc.*, 728 F.2d 989, 994 (8th Cir. 1984) (Gibson, J., dissenting) ("Congress did not intend by Title VII . . . to guarantee a job to every person regardless of qualifications . . . .") (quoting *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 800 (1972)). Our concern is assuaged in this case because there is no evidence suggesting that Captain Davison's long-term and unwavering commitment to opposing the Plan was undertaken simply to ensure that she would be promoted.

to promote her, the burden now shifts to Appellees to demonstrate that the same employment action would have been taken even in the absence of the protected activities. *See Mt. Healthy*, 429 U.S. at 287; *see also Altonen v. City of Minneapolis*, No. 06-3527, slip op. at 8 (8th Cir. June 4, 2007) (stating that evidence that gives rise to an "inference of retaliatory motive" is sufficient to shift the burden to the employer to demonstrate that employer would have taken the same action regardless of the protected conduct). The district court found that Appellees satisfied their burden in light of Chief Forte's testimony that he always selects the candidate with the highest interview score, which Captain Davison never received. Captain Davison argues that there is a genuine issue of material fact regarding Chief Forte's same-decision defense. In support of her argument, Davison presents evidence that on two occasions Chief Forte did not select candidates with the highest interview scores.

Appellees do not dispute that the two deviations occurred—when Chief Forte promoted both Cornell and Westall over candidates with higher interview scores. Rather, Appellees argue that because Chief Forte has complete discretion over which certified candidate to hire and is not bound by his personal practice of always selecting the candidate with the highest interview score, Cornell's and Westall's promotions do not invalidate their same-decision defense. Viewing the evidence in the light most favorable to Captain Davison, we cannot conclude that as a matter of law Chief Forte demonstrated that he would have made the same decision in the absence of her protected activities. *See Mt. Healthy*, 429 U.S. at 287.

With respect to Cornell's promotion, we recognize that the difference between her interview score and Thomas's interview score was slight, indeed only 0.66 points. Nonetheless, Chief Forte's decision to promote Cornell stands in direct conflict with his testimony that he selects the top-scoring interviewee "100% of the time." In light of this categorical assertion by Chief Forte, we believe that accepting Appellees' position that Cornell's and Thomas's interview scores were "substantially identical" and that therefore Chief Forte's deviation from his policy is not significant borders too closely on weighing the evidence and assessing Chief Forte's credibility, tasks that we

-14-

reserve for a jury. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). ("Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of the judge, whether he is ruling on a motion for summary judgment or for a directed verdict.")

Similarly, we believe that Captain Davison's proffered evidence regarding Westall's promotion creates a genuine issue of material fact as to whether Chief Forte would have made the same decision. Twenty-three positions for Captain were open when top-certified candidate Westall interviewed for the position. His interview score placed him 24th out of the 25 certified candidates. If it actually were Chief Forte's policy to select candidates with the highest interview scores, Westall would not have been selected. Like Westall, Captain Davison was the top-certified candidate and had an interview score that ranked her one spot below the number of positions available, at least for the second and third Arson Investigator promotion opportunities.

In combination, the evidence presented by Captain Davison regarding Cornell's and Westall's promotions, which directly contradicts Chief Forte's testimony, is sufficient to create a genuine issue of material fact as to whether Chief Forte would have made the same decision in the absence of her protected activities. *See Mt. Healthy*, 429 U.S. at 287. Appellees' same-decision defense rests solely on Chief Forte's categorical policy of hiring the candidate with the top interview score. Captain Davison presented evidence that would allow a reasonable jury to conclude that because Chief Forte deviated from his policy in the past, he may have deviated to hire Captain Davison as well had she not engaged in the protected activities. Thus, we conclude that the district court's grant of summary judgment in favor of Chief Forte was improper.

B.    Municipal Liability

The City of Minneapolis may be held liable under section 1983 for Chief Forte's actions if one of its customs or policies caused the violation of Captain

-15-

Davison's First Amendment rights. *Monell v. Dep't of Soc. Servs. of New York*, 436 U.S. 658, 690-91 (1978). We agree with the district court that Captain Davison failed to present any evidence of a policy, officially adopted and promulgated by the City of Minneapolis, or a practice, so permanent and well-settled so as to constitute a custom, that existed and through which Chief Forte acted to deny her the promotions.[7] *City of St. Louis v. Praprotnik,* 485 U.S. 112, 121 (1988).

However, even in the absence of an official policy or a custom, the Supreme Court has made clear that though "[p]roof of a single incident of unconstitutional activity is not sufficient to impose liability under *Monell*," *Oklahoma City v. Tuttle*, 471 U.S. 808, 823-24 (1985), "an unconstitutional government policy could be inferred from a single decision taken by the highest officials responsible for setting policy in that area of the government's business," *Praprotnik*, 485 U.S. at 123. In this scenario, "[m]unicipal liability attaches only where the decisionmaker possesses final authority to establish municipal policy with respect to the action ordered." *Pembaur v. City of Cincinnati*, 475 U.S. 469, 481 (1986). The district court also denied Captain Davison's *Monell* claim on this ground, finding that there was no evidence that Chief Forte had the final authority to make municipal policy. On appeal, Captain Davison argues that Chief Forte's authority to decide whom to promote in the Fire Department is enough to subject the City of Minneapolis to liability under section 1983. Captain Davison's argument fails as a matter of law.

---

[7]Captain Davison argues that because "Chief Forte was the final decision maker concerning who to promote to the position of Arson Investigator . . . [his] retaliation against Captain Davison amounts to a municipal 'custom.'" However, Chief Forte's authority to promote individuals in the Fire Department, in and of itself, does not rise to the level of a custom. *See Monell*, 436 U.S. at 691 (requiring a custom under section 1983 to be "persistent and widespread" or "permanent and well settled"). Captain Davison has not attempted to satisfy the requirements to prove that such a municipal custom exists. *See also Kuha v. City of Minnetonka*, 365 F.3d 590, 604 (8th Cir. 2003).

The Supreme Court has distinguished final policymaking authority from final decisionmaking authority. In *Pembaur*, the Court supplemented its pronouncement that "[t]he fact that a particular official—even a policymaking official—has discretion in the exercise of particular functions does not, without more, give rise to municipal liability based on an exercise of that discretion," *id.* at 481-82, with the following illustration:

> Thus, for example, the County Sheriff may have discretion to hire and fire employees without also being the county official responsible for establishing county employment policy. If this were the case, the Sheriff's decisions respecting employment would not give rise to municipal liability, although similar decisions with respect to law enforcement practices, over which the Sheriff *is* the official policymaker, *would* give rise to municipal liability. Instead, if county employment policy was set by the Board of County Commissioners, only that body's decisions would provide a basis for county liability. This would be true even if the Board left the Sheriff discretion to hire and fire employees and the Sheriff exercised that discretion in an unconstitutional manner; the decision to act unlawfully would not be a decision of the Board. However, if the Board delegated its power to establish final employment policy to the Sheriff, the Sheriff's decisions *would* represent county policy and could give rise to municipal liability.

*Id.* at 483 n.12; *see also Praprontik*, 485 U.S. at 128 (holding that even assuming that supervisors transferred plaintiff in retaliation for speech, "it says nothing about the actions of those whom the law established as the maker of municipal policy in matters of personnel administration"). We believe the facts of this case are encompassed by the *Pembaur* hypothetical and agree with our sister circuits that "[t]he discretion to hire and fire does not necessarily include responsibility for establishing related policy." *Greensboro Prof'l Fire Fighters Ass'n, Local 3157 v. City of Greensboro*, 64 F.3d 962, 966 (4th Cir. 1995); *accord Radic v. Chicago Transit Auth.*, 73 F.3d 159, 161 (7th Cir. 1996) (noting the plaintiff's argument was flawed because of its "failure accurately to distinguish between authority to make administratively final decisions and authority to establish official municipal policy") (citing *Monell* and *Pembaur*).

In other words, although we acknowledge that Chief Forte "had the authority to select particular individuals for promotion and even to design the procedures governing promotions within his department, this authority d[oes] not include responsibility for establishing substantive personnel policy governing the exercise of his authority." *Greensboro*, 64 F.3d at 965. Because Captain Davison has not alleged[8] and offers no proof that Chief Forte was delegated authority to make "final employment policy," as opposed to promotion procedures within the Fire Department, her argument that Chief Forte's final decisionmaking authority satisfies *Monell* fails. *See Pembaur*, 475 U.S. at 483 & n.12; *Praprotnik*, 485 U.S. at 128; *Greensboro*, 64 F.3d at 965-66.

Even if Captain Davison had argued that Chief Forte was delegated final policymaking authority regarding employment practices on behalf of the City of Minneapolis, we would conclude that he was not. "[W]hether an official had final policymaking authority is a question of state law." *Pembaur*, 475 U.S. at 483 (noting that "[a]uthority to make municipal policy may be granted directly by a legislative enactment or may be delegated by an official who possesses such authority"). In cases such as this one involving a city official, courts consult the applicable city charter, code or ordinances. *See Greensboro,* 64 F.3d at 965 (citing a city ordinance as establishing the authority conferred upon the City Manager and City Council with regard to employer-employee relations for the purpose of a section 1983 liability determination); *Meyers v. City of Cincinnati,* 14 F.3d 1115, 1118 (6th Cir. 1994) (citing Cincinnati's Charter and Administrative Code as establishing the authority of

---

[8]In her complaint, Captain Davison alleged that the unlawful employment actions were "based on the policymaking and final decision-making authority of the defendant City of Minneapolis." As stated, we agree with Appellees' response that Captain Davison "failed to produce evidence of an official policy of the City of Minneapolis which disfavors union members for promotional advancement." Captain Davison rephrased her *Monell* argument during the summary judgment proceedings and stated that "Chief Forte was the final *decision maker* concerning who to promote to the position of Arson Investigator." (Emphasis added.) Nowhere in the record does Captain Davison allege that Chief Forte had final *policymaking* authority for the City of Minneapolis regarding employment practices.

the City Manager for the purpose of a section 1983 liability determination); *Feliciano v. City of Cleveland,* 988 F.2d 649, 655 (6th Cir. 1993) ("The applicable Ohio law, that is, the City Charter of Cleveland and section 135.09(a) of the Cleveland Code, reveals that the Chief of Police is subordinate to the Director of Public Safety.") (internal citations omitted).

Our review of the Minneapolis Charter and Code of Ordinances reveals that the Fire Chief has not been delegated final policymaking authority regarding employment practices for the Fire Department. Rather, it reveals that the City Coordinator and Civil Service Commission are vested with final policymaking authority regarding employment practices for the entire city, including the Fire Department. For example, the Minneapolis Charter establishes and authorizes the Civil Service Commission to make, amend or repeal rules in order to promote sound personnel practices for the entire city. Minneapolis, Minn. Charter, ch. 19 §§ 4, 7. Likewise, the City Coordinator provides administrative and management services for the city, including personnel. 2 Minneapolis, Minn. Code of Ordinances § 21.10. In contrast, the Fire Chief is limited in his authority to the operations of the Fire Department. 9 Minneapolis, Minn. Code of Ordinances § 173.20. Thus, even though Chief Forte may have had final authority to determine whom to promote to Arson Investigator and also to design the particular procedures to be used when doing so, he was not authorized to establish policy regarding employment practices, including policy regarding consideration of an employee's union status or activity in making promotion decisions. *See Greensboro*, 64 F.3d at 966. As a matter of law, that authority rests with the Civil Service Commission and the City Coordinator, not the Fire Chief. *Cf. Bechtel v. City of Belton*, 250 F.3d 1157, 1158, 1161 (8th Cir. 2001) (holding no municipal liability in light of City Administrator's "ultimate authority to approve or

rescind departmental personnel decisions" despite evidence that the "Fire Chief was in charge of establishing rules, regulations, policies and procedures for the operation of the fire department").[9]

In sum, without authority delegated to him, either by the city Charter or Code of Ordinances, to make final municipal policy regarding employment practices, Chief Forte's final decisonmaking authority regarding whom to promote in the Fire Department is insufficient to subject the City of Minneapolis to liability for his actions. As such, we conclude that the district court correctly granted summary judgment in favor of the City of Minneapolis.

## III. CONCLUSION

For the foregoing reasons, we affirm the district court's entry of summary judgment as to the City of Minneapolis and reverse its entry of summary judgment as to Chief Forte, and we remand for further proceedings consistent with this opinion.

COLLOTON, Circuit Judge, concurring in the judgment in part and dissenting in part.

Five firefighters were considered by the fire chief for three promotions that were available within the Minneapolis Fire Department between October 2002 and November 2003. One unsuccessful applicant, Kathy Davison, was an outspoken critic

---

[9] Captain Davison cites *Angarita v. St. Louis County*, 981 F.2d 1537 (8th Cir. 1992), in support of her argument for municipal liability. In *Angarita*, the court made a finding that "[the Superintendent of Police] had final policymaking authority in the St. Louis County Police Department." *Id*. at 1547. Because "whether an official had final policymaking authority is a question of state law," *Pembaur*, 475 U.S. at 483, "numberless factual scenarios . . . may come to light," *Praprotnik*, 485 U.S. at 125. We do not believe that *Angarita* compels a finding that Chief Forte had final policymaking authority because we "would not be justified in assuming that municipal policymaking authority lies somewhere other than where the applicable law purports to put it." *Praprotnik*, 485 U.S. at 126.

of the fire chief, Rocco Forte. The other four candidates apparently went about their duties quietly, expressing no public views on the fire chief's policies or performance. As far as the First Amendment is concerned, each applicant had an equal right to a promotion. By reversing the district court's dismissal of Davison's discrimination claim and remanding the case for trial, the majority opinion extends the law beyond an appropriate guarantee against discrimination, and goes too far toward granting preferential treatment to an outspoken critic of a public employer. In the process, the majority sweeps aside several circuit precedents that guide our analysis of motions for summary judgment in retaliation cases. Accordingly, I respectfully dissent from that part of the opinion that reverses the judgment in favor of Forte. Because there can be no municipal liability without an underlying constitutional violation, *McCoy v. City of Monticello*, 411 F.3d 920, 922 (8th Cir. 2006), I concur in the judgment affirming the dismissal of Davison's claim against the city.

Like a claim of retaliation under Title VII of the Civil Rights Act, *see Okruhlik v. Univ. of Arkansas*, 395 F.3d 872, 878 (8th Cir. 2005), a claim of retaliation for the exercise of First Amendment rights may be analyzed under two frameworks when the court is presented with a motion for summary judgment. The most common is the tripartite burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), often described as the "indirect" method of proof. Under this approach, the plaintiff must first make what our court has described as a "minimal evidentiary showing" necessary to establish a prima facie case of discrimination. *E.g.*, *Pope v. ESA Servs., Inc.*, 406 F.3d 1001, 1007 (8th Cir. 2005). At that point, the burden of *production* shifts to the employer to articulate a legitimate non-retaliatory reason for the adverse employment action, but the burden of *proof* remains with the plaintiff to show a genuine issue of fact that an impermissible consideration was a motivating factor in the employment decision. An alternative framework, in which the burden of proof shifts to the employer to show as a matter of law that he would have made the same decision absent the plaintiff's protected activity, *see Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977), applies only where a plaintiff produces "direct evidence" that the employer used the plaintiff's speech as a criterion

in the promotion decision. *Graning v. Sherburne County*, 172 F.3d 611, 615 n.3 (8th Cir. 1999); *accord Duffy v. McPhillips*, 276 F.3d 988, 991 (8th Cir. 2002); *Hudson v. Norris*, 227 F.3d 1047, 1050-51 (8th Cir. 2000); *see also Carroll v. U.S. Dept. of Labor*, 78 F.3d 352, 357 (8th Cir. 1996) ("This type of *Mt. Healthy/Price Waterhouse* mixed motive analysis, however, applies only in 'dual motive' cases where the complainant produces evidence that directly reflects the use of an illegitimate criterion in the challenged decision.") (internal quotation omitted). This well-entrenched circuit precedent is consistent with the Supreme Court's decision in *Mt. Healthy*, which did not involve a motion for summary judgment, *cf. Griffith v. City of Des Moines*, 387 F.3d 733, 735-36 (8th Cir. 2004), and which, in any event, shifted the burden of proof only after an employee produced direct evidence that he was not hired because of protected speech on a radio program. *Mt. Healthy*, 429 U.S. at 282-84 & n.1, 287. The *McDonnell Douglas* paradigm has been regularly applied by the district courts of this circuit to resolve motions for summary judgment in First Amendment retaliation cases.[10]

The majority nonetheless declines to follow the methodology of *Graning*, *Duffy*, and *Hudson*, and opts instead for an approach that gives the plaintiff the best of both worlds. In concluding that Davison made a prima facie case, the majority relies substantially on precedents that merely shifted the burden of *production* under the *McDonnell Douglas* framework. *Ante*, at 11-12 (discussing *Hughes v. Stottlemyre*, 454 F.3d 791, 799-800 (8th Cir. 2006), and *Hudson*, 227 F.3d at 1051); *see also Hughes v. Stottlemyre*, No. 04-4053, 2006 WL 3498325, at *1 (W.D. Mo. Dec. 4,

---

[10]*See, e.g., Johnson v. Ark. State Hospital*, No. 4:05CV00794, 2007 WL 707341, at *2 (E.D. Ark. Mar. 5, 2007); *Green v. City of St. Louis*, No. 4:05CV198, 2006 WL 1663439 (E.D. Mo. June 15, 2006); *Glandon v. Keokuk County Health Ctr.*, 408 F. Supp.2d 759, 767 (S.D. Iowa 2005); *Sale v. Mask*, No. 4:04CV00219GH, 2005 WL 1771184, at *5 (E.D. Ark. July 15, 2005); *Cook v. City of Elkader*, No. C03-1029, 2005 WL 151937, at *16 (N.D. Iowa Jan. 21, 2005); *Shepard v. Wapello County*, 250 F. Supp.2d 1112, 1118 (S.D. Iowa 2003); *Koehn v. Indian Hills Comty. Coll.*, No. Civ. 4-02-10273, 2003 WL 21976025, at *3 (S.D. Iowa Aug. 5, 2003); *Vukelic v. Bartz*, 245 F. Supp.2d 1068, 1077 (D. N.D. 2003).

2006) (concluding on remand that *McDonnell Douglas* paradigm applies). Although the prima facie case requirement under *McDonnell Douglas* is "not onerous" and should not be "conflated with the ultimate issue of discrimination," *Rodgers v. U.S. Bank*, 417 F.3d 845, 852 (8th Cir. 2005), the majority treats it for purposes of summary judgment as sufficient to prove conclusively that the employer acted with retaliatory motive – regardless of the employer's proffered legitimate non-retaliatory reasons for the promotion decisions. *Ante*, at 11-14; *but cf. Sprenger v. Fed. Home Loan Bank*, 253 F.3d 1106, 1111 (8th Cir. 2001) (holding that an employee's attempt to prove actual discrimination requires "more substantial evidence" than a prima facie case, because evidence of pretext and discrimination "is viewed in light of the employer's justification"). After finding a prima facie case, the majority considers only whether the employer would have made the same decision despite his allegedly impermissible motive. *Ante*, at 14; *see Price Waterhouse v. Hopkins*, 490 U.S. 228, 254, 258 (1989) (citing *Mt. Healthy* as a case that "most resemble[s] this one," and then holding that "the defendant may avoid a finding of liability only by proving by a preponderance of the evidence that it would have made the same decision even if it had not taken the [impermissible factor] into account.").

I would instead follow our circuit's predominant approach and apply the *Mt. Healthy* paradigm only if Davison has produced direct evidence of discrimination.[11]

---

[11]The court in *Altonen v. City of Minneapolis*, No. 06-3527, 2007 WL 153872 (8th Cir. June 4, 2007), concluded that the plaintiff failed to establish a prima facie case, and thus did not ultimately shift the burden of proof to the employer based on something less than "direct evidence" of discrimination. If it had done so, then the opinion would have conflicted with *Graning*, 172 F.3d at 615 n.3, which was authored by the same judge. *Calvitt v. Minneapolis Public Schools*, 122 F.3d 1112 (8th Cir. 1997), also authored by the same judge, apparently based its reversal of a grant of summary judgment on direct evidence of retaliation. *Id*. at 1118 ("There is evidence that the school district denied him a fair opportunity to be reappointed to Four Winds because of his speech. *The school district sent him a letter stating that he would not be reassigned to Four Winds in order to 'forestall any complaint of Whistle Blowing.'*") (emphasis added)). The panel in *Stever v. Independent School District No. 625*, 943 F.2d 845 (8th Cir. 1991), applied a "pretext" analysis (consistent with

-23-

"Direct evidence" is evidence "showing a specific link between the alleged discriminatory animus and the challenged decision, sufficient to support a finding by a reasonable fact finder that an illegitimate criterion actually motivated the adverse employment action." *Griffith*, 387 F.3d at 736 (internal quotation omitted). This must be "strong" evidence that "clearly points to the presence of an illegal motive." *Id*. Examples of direct evidence, in the context of sex and race discrimination, respectively, include a statement by the employer that "no woman would be named to a B scheduled job," *Burns v. Gadsden State Cmty. Coll.*, 908 F.2d 1512, 1517-19 (11th Cir. 1990), or a statement by the person responsible for promotion decisions that "if it was his company, he wouldn't hire any black people," *EEOC v. Alton Packaging Corp.*, 901 F.2d 920, 923-25 (11th Cir. 1990). *See Beshears v. Asbill*, 930 F.2d 1348, 1354 (8th Cir. 1991) (favorably citing *Burns* and *Alton Packaging*). By contrast, "statements by decisionmakers unrelated to the decisional process itself" do not constitute "direct evidence" of discrimination. *Id*. at 1354 (quoting *Price Waterhouse*, 490 U.S. at 277 (O'Connor, J., concurring)); *see Rivers-Frison v. Se. Mo. Cmty. Treatment Ctr.*, 133 F.3d 616, 619 (8th Cir. 1998); *Kriss v. Sprint Commc'n Co.*, 58 F.3d 1276, 1282 (8th Cir. 1995).

The record generated by Davison is bereft of "direct evidence" that Chief Forte denied her a promotion based on her exercise of First Amendment rights. Her case is entirely circumstantial, and it is not supported by strong evidence that provides a "specific link" between the alleged discriminatory animus and the challenged promotion decisions. As the majority opinion demonstrates, *ante*, at 10-12, she relies entirely on the temporal proximity of her speech to the promotion decisions and on

*McDonnell Douglas*) to conclude that the plaintiff presented a submissible case. *Id*. at 853 (holding that evidence raised "a disputed issue of fact regarding whether the District used Stever's purported nursing expertise *as a pretext* for transferring her in retaliation for her outspokenness on matters of public concern.") (emphasis added). There is no indication that the district courts of this circuit have interpreted *Calvitt* or *Stever* to preclude a *McDonnell Douglas* analysis at the summary judgment stage in First Amendment retaliation cases when the plaintiff relies on indirect evidence to prove that protected speech was a motivating factor.

statements by the fire chief *unrelated to the decisional process itself* to support an inference of discriminatory motivation. Indeed, the majority makes no assertion that Davison has presented the sort of direct evidence required to trigger the mixed motive analysis of *Mt. Healthy* under *Graning*, *Duffy*, and *Hudson*.

Because Davison has not produced direct evidence of discrimination, *McDonnell Douglas* provides the proper framework for considering her claim, and the burden of proof remains with Davison throughout. *Graning*, 172 F.3d at 615 n.3.[12] As the record was fully developed on the motion for summary judgment, we may dispense with the sequential steps of the burden-shifting framework and focus on the ultimate question of whether there was sufficient evidence of discrimination to make a submissible case of unconstitutional action by the fire chief. *Jones v. United Parcel Serv., Inc.*, 461 F.3d 982, 992 (8th Cir. 2006), *cert. denied*, 127 S. Ct. 2088 (2007); *Riser v. Target Corp.*, 458 F.3d 817, 820-21 (8th Cir. 2006), *cert. denied*, 127 S. Ct. 1382 (2007). I conclude that Davison also fails to generate a submissible case under that framework.

Much of the evidence cited by Davison does little to advance her claim. Of course, the fire chief was "aware" of Davison's protected activities, *ante*, at 9, but an outspoken employee cannot make a case of discrimination simply by showing that the

---

[12]That a plaintiff survives a motion for summary judgment through the indirect *McDonnell Douglas* method of proof, by showing a genuine issue of fact as to whether the employer's explanation was pretext for retaliatory motive, does not mean that *Mt. Healthy* is irrelevant to the determination of liability at trial. If the jury ultimately rejects the employer's legitimate non-retaliatory explanation, and concludes that the employer was actually motivated by *both* permissible and impermissible considerations, then the jury may find for the employer if he proves that he would have made the same decision even without taking the plaintiff's speech into account. *See Gooden v. Neal*, 17 F.3d 925, 929 (7th Cir. 1994) ("When . . . the plaintiff says that the adverse decision was based on speech, and the defendant says it was based on something else, the jury should be told what to do if it concludes that the employer had both motives. *Mt. Healthy* gives the jury that essential information.").

employer reads the newspaper or watches television. It is not significant that the fire chief was "unhappy" with and "disheartened" by Davison's public comments, *ante*, at 6, 11, for any sentient employer – accused in the media of implementing policies that led to the death of a citizen, *ante*, at 6 – presumably would experience similar emotions. It was undoubtedly an essential part of the fire chief's duties, as the head of a city department, to monitor public reaction to his policies, and that he "discussed" media coverage of opposition to his policies, *ante*, at 6, is therefore unsurprising and insignificant. We have said many times that "temporal proximity" between protected activity and an unfavorable employment decision generally is insufficient to make a submissible case, *e.g.*, *Kiel v. Select Artificials, Inc.*, 169 F.3d 1131, 1136 (8th Cir. 1999) (en banc), and that is especially true where, as here, the employee controlled the timing of the protected activity, and caused it to coincide with employment decisions that were scheduled independent of the protected activity. If these facts are viewed as substantial evidence of discriminatory animus, then virtually any outspoken critic of a public employer would be able to establish a submissible case of discriminatory retaliation, and thereby gain an advantage over less vocal public servants in competitive employment decisions.

Davison also relies on evidence that after one public meeting in which she criticized the fire department's plan, Chief Forte was "visibly upset" by her remarks and told the union president to "get [his] board under control." As the district court observed, "the full context of the quotation is not given, so it cannot be determined what precisely Forte was referring to." *Davison v. City of Minneapolis*, No. 04-3399, 2006 WL 980814, at * 4 (D. Minn. Apr. 13, 2006). Whether or not Davison was seeking a promotion at the time, the fire chief understandably was involved in urging the union president and the union board to support his policies. Because the comment was within the scope of what normally could be expected of a fire chief performing his duties, regardless of Davison's employment status, this cryptic statement is a slender reed on which to base a claim of retaliatory discrimination in the promotion process.

When viewed in light of the fire chief's explanation for the promotion decisions, *see Sprenger*, 253 F.3d at 1111, the proffered showing of discrimination does not attain "the dignity of substantial evidence" that is required to bring a case to trial. *See Taylor v. White*, 321 F.3d 710, 715 (8th Cir. 2003) (internal quotation omitted). Chief Forte made the promotion decisions after receiving a rank ordering of three candidates who were scored by an interview panel. On the second and third occasions, Forte promoted the candidate with the highest score from the interview panel – Tim Thomas and Denise Bryn, respectively. For the first position, the fire chief promoted Jennifer Cornell, who received a score of 87, rather than Thomas, who scored 87.66, or Davison, who scored 84. When asked why he promoted Cornell rather than Davison, the chief replied that he followed the recommendation of the interview panel. (R. Doc. 21, Exh. A, at 56-57). He gave the same reason for selecting Thomas and Bryn. (*Id.* at 67, 76). It is undisputed that on each of the three occasions, the fire chief promoted a candidate whom the interview panel ranked higher than Davison. There is no showing that the members of the interview panel harbored retaliatory animus toward Davison.

Davison and the majority make much of the fact that while Forte said that he selected the person recommended by the interview panel "100 percent of the time," (*id.* at 57, Exh. B, at 325), he actually deviated from the panel's recommendation twice – that is, in 275 promotion decisions, Forte promoted the top-scoring candidate only 99.3 percent of the time. On two occasions during his six-year tenure, Forte promoted the second-ranked candidate. This minor discrepancy does not create a trial-worthy case of discrimination, because the showing of pretext is weak, and the two aberrational cases do nothing to bolster Davison's claim that she was a victim of discrimination. *See Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 148 (2000). It is undisputed that Davison *never* was the candidate ranked highest by the unbiased interview panel. Forte did not, therefore, select a second-ranked candidate over Davison while she was ranked first. When the chief selected Cornell for the first position, he passed over the first-ranked Thomas. Davison was ranked number three.

Nor does the evidence support an inference that Forte's selection of the *first-ranked* candidate over Davison for the second and third positions was motivated by discriminatory intent. In the two instances over six years when Forte did select a second-ranked candidate, the difference in scores between the first two candidates was *de minimis*. Jennifer Cornell scored a mere 0.66 points lower than Tim Thomas when Cornell was selected. Jeffrey Westall scored one point lower than a first-ranked candidate when Forte promoted Westall in 1999. In addition, Westall – the top-certified candidate by the human resources department – failed in his application for twenty-two promotions before Forte finally selected him as the second-ranked candidate for the twenty-third position. Davison, by contrast, scored 3.66 points below Thomas when Thomas was selected, and 20 points below Bryn when Bryn was selected. She was unsuccessful only three times in the promotion process. Given these widely disparate circumstances, there is no reasonable inference that Forte's failure to deviate from the interview panel's recommendation – for what would have been only the third time in at least 275 decisions – to select a second-ranked Davison over a first-ranked Thomas or Bryn was motivated by an intent to retaliate.

To survive a motion for summary judgment, a plaintiff must show more than a "colorable" claim of discrimination. She must produce evidence that is "significantly probative" of discriminatory intent. *See Anderson v. Liberty Lobby*, *Inc.*, 477 U.S. 242, 249 (1986). The evidence in this case does not meet that threshold. It surely does not constitute strong, "direct evidence" of discrimination that warrants treating this as a "mixed motive" case in which the burden of proof shifts to the fire chief. To the contrary, there is every reason on this record to believe that Jennifer Cornell, Tim Thomas, and Denise Bryn earned and deserved the promotions that they received. I would therefore affirm the judgment of the district court.

_____