2001 ND 54

**John E. ROGSTAD, Plaintiff and Appellant,**

v.

**DAKOTA GASIFICATION COMPANY, a North Dakota corporation, Defendant and Appellee.**

**No. 20000242.**

Supreme Court of North Dakota.

March 20, 2001.

Steven L. Latham of Wheeler Wolf, Bismarck, ND, for plaintiff and appellant.

Tracy Vigness Kolb (argued) and Lance D. Schreiner of Zuger Kirmis & Smith, Bismarck, ND, for defendant and appellee.

NEUMANN, Justice.

[¶ 1] John E. Rogstad appeals from a summary judgment dismissing his negligence action against Dakota Gasification Company ("DGC"). Rogstad argues the district court erred in granting summary judgment because DGC owed him a duty to provide for his safety. Because we conclude DGC did not owe a duty to Rogstad, as a matter of law, we affirm.

I

[¶ 2] John E. Rogstad was an ironworker employed by Industrial Contractors, Inc. ("ICI"). DGC hired ICI as an independent contractor for the construction of cooling towers at DGC's plant near Beulah.

[¶ 3] In his deposition, Rogstad testified he received orientation and training when he began working as an ICI employee. Rogstad signed a receipt verifying he received the contract personnel safety handbook ("safety manual"). He also signed a form acknowledging he received a copy of the job rules and regulations, an explanation of the hazard communication program including the location of Material Safety Data Sheets, and safety equipment including a hard hat and eye protection. Rogstad also testified he was shown an orientation video.

[¶ 4] Rogstad's ICI foreman was Larry Morris. Rogstad testified that if he had a safety concern or required additional safety equipment, he would raise the concern or request with Morris. Twice during his deposition, Rogstad testified Morris directed Rogstad where to work at the plant.

[¶ 5] Although Rogstad worked on various jobs during his time at the plant, on July 9, 1996, Rogstad and a coworker were assigned to work in a small dome used to store ammonium sulfate byproduct. Rogstad testified that Morris and Robert Vayda took Rogstad and his coworker to the dome and talked to them about the work to be performed. The parties disputed whether Vayda was employed by DGC or by another independent contractor. Rogstad testified Morris and Vayda directed him to perform welding work inside the dome and to construct a doorway to prevent ammonium sulfate from leaving the dome. Rogstad testified Vayda showed Morris what he wanted done in the dome. Rogstad also testified Vayda told Rogstad and his coworker what work needed to be done.

[¶ 6] Rogstad worked in the dome approximately a day and a half. Rogstad testified that both Morris and Vayda visited the dome a couple of times daily to check on the work. Rogstad testified he believed Vayda was a DGC employee and was in charge of the project.

[¶ 7] Rogstad testified that while he was working in the dome, his eyes burned and he had trouble breathing. Rogstad stated he mentioned to both Morris and Vayda that he was uncomfortable and that his lungs were burning, but he received no response. As Rogstad and his coworker were moving out of the dome, Rogstad claims another DGC employee whom he did not know, wearing a DGC uniform and hard hat, told Rogstad and his coworker they should not be working in the dome because the air had not been tested. Rogstad testified another DGC employee came to the work site with an air tester shortly after and told Rogstad and his coworker they were not supposed to be in the dome.

[¶ 8] Rogstad continued working at the plant until July 25, 1996, when he experienced difficulty breathing and was taken to the hospital. Rogstad was diagnosed with reactive airway dysfunction syndrome.

[¶ 9] Rogstad sued DGC, claiming negligence for failing to provide for his safety while he was working in the dome. DGC moved for summary judgment asserting, as a matter of law, it did not have a duty to provide for Rogstad's safety. The district court granted DGC's motion for summary judgment dismissing Rogstad's negligence action. Rogstad appeals.

## II

[¶ 10] Summary judgment under Rule 56(c), N.D.R.Civ.P., is a method for promptly and expeditiously disposing of a controversy without trial if either party is entitled to a judgment as a matter of law and if no dispute exists as to either the material facts, or the inferences to be drawn from undisputed facts, or if resolving factual issues would not alter the results. *Mead v. Farmers Union Mut. Ins. Co.*, 2000 ND 139, ¶ 12, 613 N.W.2d 512. A district court deciding a motion for summary judgment is required to view the evidence in the light most favorable to the resisting party. *Schaefer v. Souris River Telecomm. Coop,* 2000 ND 187, ¶ 8, 618 N.W.2d 175. Although the party seeking summary judgment bears the initial burden of showing there is no genuine issue of material fact, the party opposing the motion may not simply rely upon the pleadings or unsupported allegations. *Grinnell Mut. Reinsurance Co. v. Farm & City Ins. Co.,* 2000 ND 163, ¶ 18, 616 N.W.2d 353. Rather, the resisting party must present competent admissible evidence by affidavit or other comparable means raising an issue of material fact and must, if appropriate, draw the court's attention to relevant evidence in the record by setting out the page and line in depositions or other comparable documents containing testimony or evidence raising an issue of material fact. *Id.* at ¶ 18. Whether the district court properly granted summary judgment is a question of law subject to de novo review. *Garofalo v. Saint Joseph's Hosp.,* 2000 ND 149, ¶ 6, 615 N.W.2d 160.

[¶ 11] Here, the district court granted DGC's summary judgment motion, concluding no genuine issue of material fact existed regarding whether DGC owed a legal duty to Rogstad and DGC was entitled to judgment as a matter of law.

[¶ 12] To establish a cause of action for negligence, a plaintiff must show the defendant has a duty to protect the plaintiff from injury. *Pechtl v. Conoco, Inc.,* 1997 ND 161, ¶ 7, 567 N.W.2d 813. We have stated negligence consists of a duty on the part of an allegedly negligent party to protect the plaintiff from injury, a failure to discharge the duty, and a resulting injury proximately caused by the breach of the duty. *Gullickson v. Torkelson Bros., Inc.,* 1999 ND 155, ¶ 7, 598 N.W.2d 503. Whether a duty exists is generally a preliminary question of law for the court to decide. *Id.* at ¶ 6. If no duty exists, there is no negligence. *Id.* at ¶ 7.

## III

[¶ 13] Rogstad argues the district court erred in granting summary judgment because DGC owed him, as a matter of law, a duty to provide for his safety.

[¶ 14] Generally, one who employs an independent contractor is not liable for the negligence of the independent contractor. *Pechtl,* 1997 ND 161, ¶ 9, 567 N.W.2d 813; *see* Restatement (Second) of Torts § 409 (1965). However, Restatement (Second) of Torts § 414 creates an exception to the general rule for an employer who retains control over the independent contractor's work:

> One who entrusts work to an independent contractor, but who retains the control of any part of the work, is subject to liability for physical harm to others for whose safety the employer owes a duty to exercise reasonable care, which is caused by his failure to exercise his control with reasonable care.

[¶ 15] In *Fleck v. ANG Coal Gasification Co.,* 522 N.W.2d 445, 448 (N.D.1994), we explained the degree of retained control necessary to impose a duty on the employer of an independent contractor:

> The liability created by Section 414 arises only when the employer retains the right to control the method, manner, and operative detail of the work; it is not enough that the employer merely retains the right to inspect the work or to make suggestions which need not be followed. Comment c to Section 414 explains the difference:
>
> > In order for the rule stated in this Section to apply, the employer must have retained at least some degree of control over the manner in which the work is done. It is not enough that he has merely a general right to order the work stopped or resumed, to inspect its progress or to receive reports, to make suggestions or recommendations which need not necessarily be followed, or to prescribe alterations and deviations. Such a general right is usually reserved to employers, but it does not mean that the contractor is controlled as to his methods of work, or as to operative detail. There must be such a retention of a right of supervision that the

contractor is not entirely free to do the work in his own way.

[¶ 16] The doctrine of retained control does not make the employer vicariously liable for the independent contractor's acts; rather, it creates an independent basis of liability for the employer's failure to exercise retained control with reasonable care. *Pechtl,* 1997 ND 161, ¶ 11, 567 N.W.2d 813. The duty created by Section 414 may arise through express contractual provisions retaining the right to control some part of the operative details of the independent contractor's work or through the employer's actual exercise of retained control of the work. *Id.* at ¶ 11.

[¶ 17] Rogstad argues DGC had a duty to provide for his safety because (1) DGC retained responsibility through express contractual provisions; and (2) DGC actually retained control over his work.

A

[¶ 18] Rogstad asserts the DGC safety manual and orientation video are contractual documents containing express provisions undertaking affirmative duties and retaining DGC's responsibility for his safety and the safety of other employees of independent contractors at the plant.

[¶ 19] Under N.D.C.C. § 9–07–02, the language of a contract governs its interpretation if the language is clear and explicit and does not involve an absurdity. The contract between ICI and DGC provided that the documents listed in the Table of Contents were the "Contract Documents." It also provided:

> [The] Contract Documents set forth the entire agreement between the parties pertaining to the Work and supersedes [sic] all inquiries, proposals, agreements, negotiations and commitments, whether written or oral, prior to the date of execution of this Contract. The provisions of this Contract may be changed only by written agreement executed by the parties to this Contract.

The Table of Contents to the contract between DGC and ICI did not include either DGC's safety manual or the orientation video. There is no evidence in the record of a subsequent written agreement between DGC and ICI including the safety manual or the orientation video in the contract by reference. Accordingly, under the clear and explicit language of the contract, the safety manual and the orientation video are not contract documents.

 [¶ 20] If the intent of the parties to a contract can be ascertained from the agreement alone, interpretation of the contract is a question of law. N.D.C.C. § 9–07–04; *Garofalo v. Saint Joseph's Hosp.*, 2000 ND 149, ¶ 7, 615 N.W.2d 160. Thus, an unambiguous contract is particularly amenable to summary judgment. *Garofalo*, at ¶ 7.

[¶ 21] Here, the contract between ICI and DGC provided that ICI retained "complete control over its employees and all of its Subcontractors" and was "solely responsible for all means, methods, techniques, sequences, and portions of the Work in complying with the Agreement." The contract provided ICI was "solely responsible for initiating, maintaining and enforcing safety ... during performance of the Work." Further, under the contract, "[n]othing contained in the Agreement shall be deemed to create any contractual obligations on the part of [DGC] to any person on [sic] entity other than [ICI]."

[¶ 22] In *Pechtl*, 1997 ND 161, ¶ 12, 567 N.W.2d 813, the contract between the employer and the independent contractor stated the employer "shall have no direction or control of the method or manner in which the Work is performed by [the independent contractor] pursuant to this Contract, but shall be interested solely in determining that the desired results are secured." We concluded the explicit language of the contract between the employer and the independent contractor unambiguously gave the independent contractor control over the method, manner, and operative details of its work for the employer

and did not impose a duty on the employer. *Id.* at ¶ 12.

[¶ 23] Conversely, in *Madler v. McKenzie County*, 467 N.W.2d 709 (N.D. 1991), the contract between the employer and the independent contractor contained several ambiguities about the extent of the employer's retained control. We concluded the contract language was unclear about the extent of engineering and supervision responsibilities the employer assumed by agreeing to provide "adequate engineering, supervision, and inspection" for the work. *Id.* at 713. The contract also failed to clearly provide whether the employer retained only a general right to inspect and stop work that did not comply with the contract requirements or a broader right to control the manner in which the work was to be performed, including the handling of safety at the work site. *Id.*

[¶ 24] Here, as in *Pechtl*, the explicit language of the contract unambiguously gave ICI control over the method, manner, and operative details of its work for DGC. Thus, a duty to Rogstad did not arise based on the express provisions of DGC's contract with ICI.

### B

 [¶ 25] Rogstad asserts DGC retained actual control over the scope of the work he performed. In particular, Rogstad contends DGC retained actual control over Rogstad's work through Robert Vayda. The parties dispute whether Vayda was a DGC employee. However, for purposes of reviewing the summary judgment, we view the evidence in the light most favorable to Rogstad, and therefore we will assume Vayda was a DGC employee. *See Schaefer v. Souris River Telecomm. Coop*, 2000 ND 187, ¶ 8, 618 N.W.2d 175. Resolution of this factual issue in Rogstad's favor does not alter the result. *See Mead v. Farmers Union Mut. Ins. Co.*, 2000 ND 139, ¶ 12, 613 N.W.2d 512.

[¶ 26] Larry Morris and Vayda approached Rogstad about the job in the

dome on the morning of July 9, 1996. Vayda told Morris about the work to be done in the dome. Both Morris and Vayda checked on the progress of the work a couple of times each day. Rogstad offers no additional support for his argument that Vayda controlled Rogstad's work. Thus, Vayda's only involvement with Rogstad's work was to inform Rogstad that work was needed in the dome and to periodically check on the progress of the work. This degree of involvement, in and of itself, is not sufficient to establish Vayda directed any operative detail of Rogstad's work. *See Pechtl v. Conoco, Inc.*, 1997 ND 161, ¶ 19, 567 N.W.2d 813 (stating inspections and monitoring to ensure compliance with an employment contract do not raise an inference of retaining control of the operative details of an independent contractor's work); Restatement (Second) of Torts § 414, cmt. c.

[¶ 27] Rogstad also argues DGC retained actual control over his work because, through its statements in the safety manual and orientation video, DGC reserved a safety responsibility that went beyond the mere right to inspect Rogstad's work. Although we concluded the safety manual and the orientation video did not create a contractual duty on DGC to provide for Rogstad's safety, the contents of the safety manual and the orientation video are relevant to the determination of whether DGC retained actual control over any part of Rogstad's work.

[¶ 28] The safety manual describes several types of work permits, including the safe work permit and the hot work permit. According to the safety manual, a safe work permit was required for any type of work in any plant area and was designed to ensure that proper precautions and communications occurred prior to every job. A hot work permit was required for welding, cutting, grinding, drilling, and any other work requiring a potential ignition source or involving a potential emission-producing activity. In situations requiring a hot work permit, gas tests were mandatory and were to be performed by DGC personnel and recorded in a safe work permit more than three hours prior to beginning work. Both types of permits were to be issued by DGC personnel.

[¶ 29] Under the section pertaining to accident and hazard procedures, the safety manual stated:

Flammable and/or toxic contaminants cannot always be detected by sight or smell. . . . [S]torage tanks or lines must be checked for potential dangerous air contaminants before entry or work is begun. Such areas must be checked if vessel entry, welding or burning or other potentially hazardous work will be done. These air tests are normally performed by DGC personnel.

Thus, Rogstad argues, under the safety manual DGC retained control of and responsibility for administering safety testing before any work in the plant was started. However, this section of the safety manual also provided:

When working in an area that may contain toxic gases and/or liquids, contact with Operations personnel is mandatory. The Safe Work Permit issued for work in an operating area must include specific instructions regarding potential exposure to toxic substances. The instructions provided by Operations must be followed. Operations will review the scope of work to be performed and determine exposure potential.

[¶ 30] The orientation video similarly instructed ICI employees: "You must contact Operations personnel prior to working in an area that may contain toxic gases or liquids."

[¶ 31] There is no evidence in the record that either a safe work permit or a hot work permit were obtained before Rogstad and his coworker began their work in the dome. There is no evidence in the record that Rogstad or anyone else contacted any DGC "Operations personnel." Rogstad has not argued or demonstrated Vayda qualifies as "Operations personnel." Thus,

any testing responsibility DGC arguably may have retained was never triggered because DGC was not contacted.

[¶ 32] Moreover, the safety manual clearly provided ICI was solely responsible for Rogstad's work and safety. The manual stated:

> [ICI is] responsible for the safety of [its] employees, subcontractors and any other persons on the site related to [ICI's] project. [ICI] will notify the DGC Contract Field Coordinator, or the DGC Area Supervisor, immediately of the existence of hazardous materials, conditions or equipment at their work site, which is not under [ICI's] control. However, it is [ICI's] responsibility to take all necessary precautions to prevent injury of [its] employees, exposure to potentially hazardous products or materials, or damage to property from such hazards, until corrected by the responsible party.

[¶ 33] The only control DGC retained through the safety manual and the orientation video was that work was not to be performed without the appropriate permits, which were to be issued after necessary testing by DGC. Even if we assume, without deciding, that retention of this right may have created a duty, when properly triggered, to provide for Rogstad's safety, it did not give DGC control over the operative details of Rogstad's work.

[¶ 34] Rogstad also argues he reasonably believed DGC had done the necessary site preparation and testing for the issuance of the appropriate permits and that it was safe to perform the work Vayda directed Rogstad to perform. Rogstad's subjective beliefs, however, have no bearing on whether DGC retained actual control over his work.

[¶ 35] The record supports that ICI controlled Rogstad's work. ICI supplied all the materials for Rogstad's work. Rogstad was an employee of ICI, and ICI paid his wages, kept his time sheets, and recorded his work areas. Rogstad was told where to work by Morris, his ICI foreman. Except for Rogstad's personal tools, ICI provided the tools and equipment for Rogstad's work, including safety equipment. Rogstad reported his safety concerns to, and requested safety equipment from, Morris.

[¶ 36] Rogstad did not meet his burden of showing Vayda or anyone else acting on behalf of DGC exercised control over his work. The safety manual and orientation video do not show DGC retained actual control over Rogstad's work, other than responsibility for administering safety testing and issuing safe work permits and hot work permits, and the evidence fails to show that responsibility was ever triggered by a contact or request from Rogstad, ICI, or anyone else.

[¶ 37] Because the explicit language of the contract unambiguously gave ICI control over the method, manner, and operative details of its work for DGC; because DGC did not retain actual control over Rogstad's work, other than a safety responsibility; and because there is no evidence DGC's retained safety responsibility was triggered, DGC did not owe Rogstad a duty, as a matter law.

## IV

[¶ 38] We affirm the summary judgment dismissing Rogstad's action against DGC.

[¶ 39] GERALD W. VANDE WALLE, C.J., and MARY MUEHLEN MARING, CAROL RONNING KAPSNER, DALE V. SANDSTROM, JJ., concur.