**Benjamin GASAL, Plaintiff,**

v.

**CHS INC., Defendant.**

**Case No. 1:10–cv–010.**

United States District Court,
D. North Dakota,
Southwestern Division.

July 22, 2011.

Jonathan Charles Ruth, Marquard & Associates, Fargo, ND, for Plaintiff.

Michael C. Waller, Crowley Fleck PLLP, Bismarck, ND, for Defendant.

## ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

DANIEL L. HOVLAND, District Judge.

Before the Court is the Defendant's "Motion for Summary Judgment" filed on March 8, 2011. *See* Docket No. 11. The Plaintiff filed a response in opposition to the motion on March 28, 2011. *See* Docket

No. 14. The Defendant filed a reply brief on April 8, 2011. *See* Docket No. 16. The Court grants the motion for the reasons set forth below.

## I. *BACKGROUND*

On October 2, 2007, the Defendant, CHS, Inc. ("CHS"), through its trade name South Central Grain, entered into a contract with Grain Inspection, Inc. ("Grain Inspection") for Grain Inspection to sample and grade outgoing grain as it was loaded onto railcars at various elevators owned by CHS. The contract specified that Grain Inspection would provide the necessary inspectors, samplers, and technicians to accomplish the grading at their discretion. Grain Inspection would provide both manual and automatic sampling as the railcars were moved into and out of the testing station. CHS required that everyone working on top of the moving railcars use the fall protection or fall restraint system it provided. Grain Inspection also required the use of the fall protection system at all times when working on top of moving railcars. The parties have stipulated that the fall restraint system in use on December 20, 2007, functioned properly and complied with industry standards. *See* Docket No. 16–1.

In October 2007, Grain Inspection hired the Plaintiff, Benjamin Gasal, as a grain sampler. Gasal received on-the-job training, shadowed other workers, and reviewed written training materials. Gasal's job was to perform both manual and automatic grain testing which included working on top of the moving railcars. On December 20, 2007, Gasal was instructed to close and seal the hatches on top of the moving railcars at which time the work was temporarily suspended for technical reasons. Gasal fell asleep in a chair inside the elevator's office while waiting for work to resume. When Gasal awoke he realized that he had fallen behind on his work and that he was a few railcars behind where he should be. The fall protection system had the ability to reach a span of several railcars. Without informing the attendant that he was behind, Gasal decided to catch up with his work and forego the fall protection system's harness so he could reach beyond the fall protection system harness's limit.

While on top of the railcar and attempting to catch up with his work, Gasal worked his way to the last few railcars and continued to work without the fall protection system in place. At this time, the railcar jerked forward as a result of either the brakes being set improperly or the railcar procession moving forward. Gasal fell from the railcar and sustained a broken left arm, a fractured pelvis, a lung contusion, and radial nerve palsy in his left thumb. These injuries required surgery and physical therapy.

The affidavits of Carol Trautman and Justin Staloch, both employees of Grain Inspection at the time the accident occurred, outline in more detail the events of December 20, 2007:

> CAROL TRAUTMAN, being first duly sworn on oath, deposes and states as follows:
>
> 1. I am currently retired, but was a grain inspector for Grain Inspection, Inc. ("Grain Inspection") on December 20, 2007, and worked at the Sterling Elevator on that date.
>
> 2. In 2007, Grain Inspection sampled and tested grain at various elevators in the Jamestown, N.D. region.
>
> 3. Grain Inspection had a set process by which it sampled and tested grain. Grain Inspection made all decisions concerning how the sampling and testing process was carried out, including how many em-

ployees to take to any location and what task each employee would complete.

4. Grain Inspection employees were employed by and supervised by Grain Inspection, not by the various elevators at which Grain Inspection sampled and tested grain.

5. Before going to any location, all Grain Inspection employees, including Benjamin Gasal, received training and job shadowing. Employees were required to learn the proper methods for sampling and testing grain, including sealing the hatches on railcars after sampling the grain; to undergo job shadowing; and to complete written tests.

6. While working for Grain Inspection, I was responsible for telling employees what position they would be working in while on location at various elevators.

7. On December 20, 2007, I initially directed Benjamin Gasal to retrieve samples from the load-out room and run the samples to the onsite lab to be graded.

8. Because he was not working quickly enough in that position, however, I reassigned Benjamin Gasal to collecting samples from the chute in the load-out room and sealing the hatches on top of the moving railcars.

9. The manner in which Grain Inspection samples and tests grain at the Sterling Elevator is the same as the manner it uses at any other location that uses the automatic sampling process.

10. If a Grain Inspection employee were to fall behind while working on top of the railcars, I would expect the employee to tell someone in the control room he had gotten behind.

11. If the elevator employees were informed that a Grain Inspection employee had fallen behind in his work, I am confident the elevator employees would slow down the process.

12. Grain Inspection requires its employees to be hooked up to the fall restraint system at all times when working on top of moving railcars.

13. At the time of Benjamin Gasal's fall, I was in the grading room and did not see him fall or any events leading up to his fall.

14. I am aware, however, that when he fell from the moving railcar, Benjamin Gasal was in violation of Grain Inspection's policy, because he was not hooked up to the fall restraint system.

*See* Docket No. 12–4.

JUSTIN STALOCH, being first duly sworn on oath, deposes and states as follows:

1. I have been employed by Grain Inspection, Inc. ("Grain Inspection") since July 2005.

2. On December 20, 2007, I worked at the Sterling Elevator. Initially I was assigned to collect samples in the load-out room and seal the hatches on top of the railcars. Benjamin Gasal was assigned to take the samples I had collected and take them down to the grading room to be tested. Because Benjamin Gasal was working too slowly, however, Carol Trautman directed us to switch positions.

3. When sampling and testing grain at the various elevators, I am employed by Grain Inspection, not by the elevators. Grain Inspection sets the

process by which the team members collect and sample grain, gives us instructions, and directs us to work in certain positions at each jobsite. The only rules the elevators have for Grain Inspection employees are rules concerning safety.

4. As a new employee of Grain Inspection, I, like all employees, received training before going to my first jobsite. Training included shadowing experienced employees and completing a written test.

5. Part of the training also included what to do if an employee were to fall behind while working on top of the moving railcars. The Grain Inspection employee is supposed to inform the elevator employees that he has fallen behind, and the elevator employees then will either stop loading and wait for the Grain Inspection employee to catch up or will allow the Grain Inspection employee to go back to the missed car later.

6. Grain Inspection requires its employees to be hooked up to the fall restraint system at all times when working on top of moving railcars.

7. On December 20, 2007, before he went up on the moving railcars I reminded Benjamin Gasal that he was required to wear his safety harness and connect to the fall restraint system whenever he was working on top of the railcars.

8. I did not see Benjamin Gasal fall or what he was doing just before he fell. I am aware, however, that when Benjamin Gasal fell from the moving railcar, he was not connected to the fall restraint system. Thus, he was in violation of the rules of Grain Inspection and the elevator, and contrary to my reminder to him.

*See* Docket No. 16–2.

On October 19, 2009, Gasal filed a complaint in state court against CHS for the injuries he suffered as a result of his fall from the moving railcar. *See* Docket No. 1–1. Gasal contends that CHS owed a duty of care to ensure that those working on top of the moving railcars were safely fastened to the fall protection system. Gasal argues that CHS negligently breached its duty by failing to ensure the proper use of the fall protection system.

On February 19, 2010, CHS removed the case to federal court. *See* Docket No. 1. On March 8, 2011, CHS filed a motion for summary judgment. *See* Docket No. 11. CHS contends there are no disputed facts. CHS asserts that it is undisputed that Grain Inspection was hired as an independent contractor and the contract allowed for Grain Inspection to provide the necessary inspectors, samplers, and technicians to accomplish the grading at their discretion.

Gasal contends there are disputed facts. Gasal contends it is disputed whether Grain Inspection is a separate corporation and legal entity from CHS. Gasal asserts that it is disputed whether CHS's employee, Tim Neal, Jr., was aware of Gasal's troubles with the fall restraint system, whether Neal could see Gasal working on top of the railcar from Neal's window, and whether Neal was in complete control of the loading process as he directed the railcars to move forward while Gasal was in plain sight. Gasal also contends that it is disputed whether he was properly advised of the necessary safety measures or how to properly use the fall restraint system prior to his first day of work at the Sterling Elevator.

## II. *STANDARD OF REVIEW*

Summary judgment is appropriate when the evidence, viewed in a light most favorable to the non-moving party, indicates no genuine issues of material fact exist and, therefore, the moving party is entitled to judgment as a matter of law. *Davison v. City of Minneapolis, Minn.*, 490 F.3d 648, 654 (8th Cir.2007); *see* Fed.R.Civ.P. 56(c). Summary judgment is not appropriate if there are factual disputes that may affect the outcome of the case under the applicable substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). An issue of material fact is genuine if the evidence would allow a reasonable jury to return a verdict for the non-moving party. *Id.*

The Court must inquire whether the evidence presents sufficient disagreement to require the submission of the case to a jury or if it is so one-sided that one party must prevail as a matter of law. *Diesel Mach., Inc. v. B.R. Lee Indus., Inc.*, 418 F.3d 820, 832 (8th Cir.2005). The moving party first has the burden of demonstrating an absence of genuine issues of material fact. *Simpson v. Des Moines Water Works*, 425 F.3d 538, 541 (8th Cir.2005).

## III. *LEGAL DISCUSSION*

 This is a negligence claim based on diversity jurisdiction. It is well-established that in an action based on diversity jurisdiction, the court will apply the substantive law of North Dakota. *Atkinson v. McLaughlin*, 462 F.Supp.2d 1038, 1047 (D.N.D.2006). "Negligence consists of a duty on the part of an allegedly negligent party to protect the plaintiff from injury, a failure to discharge the duty, and a resulting injury proximately caused by the breach of the duty." *Grewal v. N.D. Ass'n of Cnts.*, 2003 ND 156, ¶ 9, 670 N.W.2d 336. "To establish a cause of action for negligence, a plaintiff must show the de-

fendant has a duty to protect the plaintiff from injury." *Rogstad v. Dakota Gasification Co.*, 2001 ND 54, ¶ 12, 623 N.W.2d 382. The existence of a duty is generally a question of law for the court to decide. However, if the existence of a duty depends on the resolution of factual issues, those issues must be resolved by the trier of fact. *Gullickson v. Torkelson Bros., Inc.*, 1999 ND 155, ¶ 6, 598 N.W.2d 503. "If no duty exists, there is no negligence." *Rogstad*, 2001 ND 54, ¶ 12, 623 N.W.2d 382.

 As a general rule, an employer is not liable for the torts of an independent contractor. *Grewal v. N.D. Ass'n of Cnts.*, 2003 ND 156, ¶ 10, 670 N.W.2d 336; *Lumpkin v. Streifel*, 308 N.W.2d 878 (N.D. 1981). However, Section 414 of the Restatement (Second) of Torts recognizes an exception to the general rule of employer non-liability. That section makes an employer liable for an independent contractor's acts on the job over which the employer has retained control. *Grewal v. N.D. Ass'n of Cnts.*, 2003 ND 156, ¶ 10, 670 N.W.2d 336; *Schlenk v. NW Bell Tel. Co., Inc.*, 329 N.W.2d 605, 612 (N.D.1983). Section 414 provides that the employer can be found liable, not vicariously for the acts of the independent contractor's employees, but directly for the employer's failure to exercise its retained control with reasonable care. *Peterson v. City of Golden Valley, N.D.*, 308 N.W.2d 550, 554 (N.D. 1981). It is well-established that employees of an independent contractor fall within the protection of Section 414. An employer of an independent contractor who retains control of the work owes a duty of care to the independent contractor's employees to exercise the retained control with reasonable care. *Madler v. McKenzie Cnty., N.D.*, 467 N.W.2d 709, 711 (N.D. 1991).

The key question in determining if an individual is an independent contractor or an employee focuses on who is in control. *Doan v. City of Bismarck, N.D.*, 2001 ND 152, ¶ 19, 632 N.W.2d 815, 822. "The employer's right to direct or control the means and manner of performing the work is dispositive regarding the employee or independent contractor classification, whether or not the right has been exercised." *Id.* "Under the doctrine of respondeat superior, if an individual is not an independent contractor, agency principles provide that the employer is vicariously liable to third persons for the negligence of the employer's agent in the transaction of the business of the agency." *Id.* The rationale for the doctrine of respondeat superior is based on the employer's right to control the employee's conduct.

The liability created by Section 414 arises only when the employer retains the right to control the method, manner, and operative detail of the work. It is not enough that the employer merely retains the right to inspect the work or to make suggestions which need not be followed. *Fleck v. ANG Coal Gasification Co.*, 522 N.W.2d 445, 448 (N.D.1994). The comments to the Restatement (Second) of Torts § 414 further clarify this concept:

> In order for the rule stated in this Section to apply, the employer must have retained at least some degree of control over the manner in which the work is done. It is not enough that he has merely a general right to order the work stopped or resumed, to inspect its progress or to receive reports, to make suggestions or recommendations which need not necessarily be followed, or to prescribe alterations and deviations. Such a general right is usually reserved to employers, but it does not mean that the contractor is controlled as to his methods of work, or as to operative de-

tail. There must be such a retention of a right of supervision that the contractor is not entirely free to do the work in his own way.

Restatement (Second) of Torts § 414 cmt. c (1965).

The North Dakota Supreme Court has explained, "The doctrine of retained control does not make the employer vicariously liable for the independent contractor's acts; rather, it creates an independent basis of liability for the employer's failure to exercise retained control with reasonable care." *Rogstad*, 2001 ND 54, ¶ 16, 623 N.W.2d at 386. The North Dakota Supreme Court discussed employer liability further in *Peterson:*

> A determination that an exception to the general rule of employer non-liability applies in a given case is tantamount to a determination that the employer in that case has a duty. Whether or not one owes a duty to another in a case such as this is an issue of law which the court must resolve before allowing a jury to hear evidence of negligence and proximate cause.

*Peterson*, 308 N.W.2d at 553.

Another exception to the general rule of employer non-liability is that employers of independent contractors may be liable under the "peculiar risk of harm" and "special danger" exception, found in Sections 416 and 427 of the Restatement (Second) of Torts. However, the North Dakota Supreme Court has adopted the majority rule and held that these two sections *do not apply* to employees of independent contractors, in part because they have received workers compensation benefits, just as Gasal did here. *See Fleck*, 522 N.W.2d at 454 ("[W]e adopt the majority view and hold that an employer of an independent contractor is not vicariously liable to the independent contractor's employees under

Sections 416 and 427 of the Restatement (Second) of Torts.").

Section 416 provides that an employer who hires an independent contractor to do work that is likely to create "a peculiar risk of physical harm to others unless special precautions are taken" is liable for physical harm caused by the failure of the contractor to take such precautions, even though the employer has provided for such precautions in the contract or otherwise. Restatement (Second) of Torts § 416 (1965). Section 427 provides that an employer who hires an independent contractor to do work involving a "special danger to others" that the employer knows or contemplates to be "inherent in or normal to the work" is liable for physical harm caused by the contractor's failure to take reasonable precautions against such danger. Restatement (Second) of Torts § 427 (1965). Sections 416 and 427 do not rest upon the personal negligence of the employer, but instead are rules of vicarious liability, or non-delegable duties. *See* Restatement (Second) of Torts §§ 416–429 (1965) introductory note. The Court finds that these exceptions do not apply in this case which both parties have acknowledged.

■ The Court finds that there is no dispute that Grain Inspection was an independent contractor of CHS. *See* Docket No. 12–2. CHS essentially argues that the contract it entered into with Grain Inspection stated that Grain Inspection would provide the necessary inspectors, samplers, and technicians to grade grain at Grain Inspection's discretion. CHS contends that it did not retain any right to control the method, manner, and operative details of the work performed by Grain Inspection and its employees. The Court agrees. Gasal has failed to produce any evidence that CHS possessed the right to direct or control the means and manner of the work performed by Grain Inspection and its employees. According to the written contract between the parties, Grain Inspection "in their discretion, [would] provide the necessary inspectors, samplers, and technicians to accomplish th[e] grading." *See* Docket No. 12–1.

There has been no evidence produced which reveals the retention of a right of control or supervision by the employer (CHS) over the work performed by the independent contractor (Grain Inspection) such that the independent contractor was not entirely free to perform the work in its own way. There are no genuine issues of material fact as to Grain Inspection's status as an independent contractor. A duty was owed to Gasal for the acts or omissions of Grain Inspection *only if* CHS retained control over the method, manner, and operative details of the work performed by Grain Inspection. The Court finds that CHS did not owe Gasal a duty to protect him from injuries caused by Grain Inspection's acts or omissions because CHS did not retain any degree of control over the work performed by Grain Inspection.[1] As a general rule, an employer is not liable for the torts of an independent contractor and the Court finds, as a matter of law, that none of the recognized exceptions to the general rule of employer non-liability apply in this case.

## IV. CONCLUSION

The Court has carefully reviewed the entire record, the parties' briefs, exhibits,

---

1. Although CHS's employee, Tim Neal, Jr., was directing the movement of the railcars, he did this from a work station in the control room, and he was not directing or controlling the work activities of Gasal. Section 414 of the Restatement (Second) of Torts makes clear that this level of activity or control is not sufficient to create a duty for the employer of an independent contractor.

deposition excerpts, and the relevant case law. The Court finds, after viewing the evidence in a light most favorable to Gasal, that Grain Inspection was an independent contractor hired by CHS to inspect, sample, and grade outgoing grain loaded onto railcars at various elevators owned by CHS. The undisputed evidence reveals that CHS did not retain control over the manner, method, or operative details of the work performed by Grain Inspection. The Court finds, as a matter of law, that CHS did not owe Benjamin Gasal a duty to protect him from injuries caused by the acts or omissions of the independent contractor, Grain Inspection. The Court further finds that none of the recognized exceptions to the general rule of employer non-liability apply in this case. Therefore, the Court **GRANTS** the defendant's motion for summary judgment (Docket No. 11).

**IT IS SO ORDERED.**