# United States Court of Appeals
### For the Eighth Circuit

————————————————

## No. 15-1415

————————————————

Cynthia Wilson

*Plaintiff - Appellant*

v.

Jayne Miller, individually and in her official capacity as Minneapolis Park and
Recreation Superintendent; Minneapolis Park and Recreation Board

*Defendants - Appellees*

————————

Appeal from United States District Court
for the District of Minnesota - Minneapolis

————————

Submitted: October 20, 2015
Filed: April 25, 2016

————————

Before RILEY, Chief Judge, SMITH and SHEPHERD, Circuit Judges.

————————

SHEPHERD, Circuit Judge.

Cynthia Wilson appeals the district court's[1] grant of summary judgment in favor
of Jayne Miller on Wilson's 42 U.S.C. § 1983 First Amendment retaliation claim and

————————————————

[1]The Honorable Ann D. Montgomery, United States District Judge for the
District of Minnesota.

the court's dismissal of Wilson's supplemental claim against Miller and the Minneapolis Park and Recreation Board asserting discrimination in violation of the Minnesota Human Rights Act. The district court found that Wilson could not demonstrate that her protected speech was a substantial or motivating factor in her adverse employment actions. We affirm.

I.

We derive our recitation of the facts from the district court's factual summary made in the light most favorable to Wilson, the non-moving party. Henderson v. Munn, 439 F.3d 497, 499 n.2 (8th Cir. 2006). The Minneapolis Park and Recreation Board (the "MPRB") has employed Appellant Cynthia Wilson, an African American woman, in various capacities since 1989. Since 2010, Appellee Jayne Miller has held the position of MPRB superintendent.

In January 2011, before Wilson engaged in the protected speech at issue in this case, the MPRB terminated Wilson for failing to supervise a staff member properly. Wilson challenged her termination and was reinstated with a 30-day suspension after a civil service hearing officer concluded that termination was too harsh. According to the civil service hearing officer, Wilson had never received any discipline prior to the recommendation for her termination and her past performance evaluations had always been "good" to "excellent." Appellee Miller attended the hearing and heard Wilson's testimony. Upon Wilson's return to work in July 2011, Wilson was directed to reimburse the MPRB for personal calls made on her cell phone issued by the MPRB. She refused to compensate the MPRB and was suspended one day for insubordination.

In the instant case, Wilson alleges that Miller retaliated against her for engaging in activity protected by the First Amendment on two separate occasions. First, on September 13, 2012 the *Minnesota Spokesman-Recorder* published an article

highlighting complaints of racial discrimination within the MPRB. The article quoted Wilson, who discussed her concerns about racial discrimination. Miller was also quoted in the article. The second occasion occurred on December 18, 2012, when Wilson attended an open budget meeting for all departments of the MPRB. The MPRB employees were encouraged to ask questions and make comments about the budget process. During the meeting, Wilson inquired into whether the MPRB was going to continue to use a certain consultant who had identified specific problems regarding the work environment at the MPRB.

Wilson asserts that Miller caused her to suffer several adverse employment actions after the newspaper published her remarks and after Wilson voiced concerns in the budget meeting. First, Wilson argues that she was denied three opportunities to advance within the MPRB when she was not selected for the positions of Deputy Superintendent, Assistant Superintendent of Recreation, or Director of Recreation Centers and Programs. The posting for Deputy Superintendent was "kind of hidden" on the MPRB's website, and Miller argues that the hidden posting was retaliation for her comments published in the newspaper. Wilson further alleges that Miller put the search for the Assistant Superintendent of Recreation "on hold" and eventually awarded the position to an external candidate in retaliation for Wilson's reinstatement. In March 2013, Wilson applied, interviewed, and was a finalist for the position of Director of Recreation Centers and Programs. Ultimately, she was not selected for the position. She asserts that Miller provided negative comments in Wilson's 2012 performance evaluation regarding Wilson's comments in the budget meeting, and that hiring managers did not choose her as the Director of Recreation Centers and Programs because of the performance evaluation.

Specifically, the performance evaluation provided that Wilson "needs improvement" in the areas of communication skills and interpersonal skills. The comments in these areas referenced Wilson's remarks at the budget meeting. On December 30, 2012, Wilson emailed Teresa Chaika, the MPRB's Human Resources

Manager, complaining that Miller retaliated against her in the annual evaluation for Wilson's questions during the budget meeting. After Wilson's complaint to Human Resources, her performance ratings in certain areas were amended. In the category of communications skills, her rating was changed from "needs improvement" to "meets expectations." In the areas of decision-making/problem-solving and interpersonal skills, her performance ratings were changed from "meets expectations" to "needs improvement." Wilson was marked as "meets expectations" in all other categories and was given an overall rating of "meets expectations."

In addition to the performance evaluation and the failure to promote Wilson, Wilson alleges that a performance improvement plan and two suspensions were retaliatory acts. In April 2013, one of Wilson's supervisors instructed Wilson to discipline two of Wilson's subordinates for their work-related conduct. Wilson completed the paperwork for written warnings but refused to sign the written warning for one employee, insisting that it did not accurately reflect her view of the appropriate disciplinary measure. As a result, Wilson received a ten-day suspension without pay for insubordination. Upon her return to work, she refused to sign the second employee's warning and received another unpaid suspension, this time for twenty days. When Wilson returned to work in July 2013, Wilson's manager placed her on a performance improvement plan as a result of her two suspensions.

Wilson filed this action, asserting claims under 42 U.S.C. § 1983 for violations of her First Amendment and equal protection rights, as well as for reprisal and aiding and abetting race and color discrimination under the Minnesota Human Rights Act. Later, she voluntarily withdrew the § 1983 equal protection claim.

The district court granted in part Defendants' motion for summary judgment and declined to exercise jurisdiction over the remaining state law claim. Specifically, the district court held that Wilson failed to establish a municipal "custom" of unconstitutional misconduct by the MPRB or that her protected speech was a

substantial or motivating factor in the employment decisions, and thus the MPRB and Miller were entitled to summary judgment on Wilson's § 1983 First Amendment retaliation claim. Finally, the district court declined to exercise supplemental jurisdiction over Wilson's state law claims. On appeal, Wilson contests the district court's holding regarding Miller's individual liability and the court's dismissal of the supplemental state law claims. We address these arguments in turn.

II.

A district court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56. "We review the district court's grant of summary judgment de novo, drawing all reasonable inferences, without resort to speculation, in favor of the non-moving party." Carrington v. City of Des Moines, Iowa, 481 F.3d 1046, 1049 (8th Cir. 2007) (quoting Johnson v. Ready Mixed Concrete Co., 424 F.3d 806, 810 (8th Cir. 2005)).

To establish a prima facie case of First Amendment retaliation, a plaintiff must allege and show that: "(1) she engaged in activity protected by the First Amendment; (2) the defendant took an adverse employment action against her; and (3) the protected conduct was a substantial or motivating factor in the defendant's decision to take the adverse employment action." Davison v. City of Minneapolis, Minn., 490 F.3d 648, 654-655 (8th Cir. 2007) (citing Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle, 429 U.S. 274, 287 (1977)). If the plaintiff satisfies this burden, then the burden shifts to the defendant "to demonstrate that the same employment action would have been taken in the absence of the protected activity." Id. at 655 (citing Mt. Healthy, 429 U.S. at 287).

Miller concedes that Wilson's newspaper interview as well as Wilson's questions and comments during the open budget meeting are protected by the First

Amendment, but argues that her performance evaluation was not an adverse employment action. Wilson asserts that the negative performance evaluation, suspensions and write-ups, a performance improvement plan, and refusal to promote her constituted adverse employment actions.

## A. Performance Evaluation

"To constitute an adverse employment action, the employer's decision must effect a material change in the terms or conditions of employment." Hughes v. Stottlemyre, 454 F.3d 791, 796 (8th Cir. 2006). Standing alone, a poor performance rating does not constitute an adverse employment action because it has no tangible effect on the employee's conditions of employment. Turner v. Gonzales, 421 F.3d 688, 696 (8th Cir. 2005). "An unfavorable evaluation is actionable only where the employer subsequently uses the evaluation as a basis to detrimentally alter the terms or conditions of the recipient's employment." Id. (quoting Spears v. Mo. Dep't of Corr. & Human Res., 210 F.3d 850, 854 (8th Cir. 2000)).

In December 2012, Wilson received an annual performance evaluation for the period of January 2012 through December 2012. Miller participated in the evaluation, which stated that Wilson "needs improvement" on her communication and interpersonal skills. The comments in the evaluation from Wilson's supervisors indicated that Wilson's questions or comments in the budget meeting came across as "negative and non-constructive rather than someone who is seeking answers and constrictive and positive solutions for the betterment of the organization." Additionally, Wilson's remarks were "outside the purpose of the meeting, which is distracting for the other meeting attendees." The supervisors' comments were primarily targeted at Wilson's demeanor in raising these concerns at the budget meeting. They did not criticize the content of her speech other than to state that the content was outside the scope of the meeting. In fact, one supervisor remarked that

Wilson was "confident in asking questions and making comments in the meetings, but sometimes her delivery style thwarts the message."

The comments regarding Wilson's demeanor were consistent with a 2011 performance review, completed prior to Wilson's protected speech at issue in this case, which assessed Wilson's performance during a probationary period following her reinstatement. In the area of communication, the 2011 performance review suggested to Wilson that she "[b]e aware of how [she] comes across to others when presenting ideas, giving feedback, and addressing concerns. Put [herself] in the listeners' shoes to self-analyze [her] tone and the unspoken characteristics of [her] communication, which have been perceived as defiant at times." The 2011 performance review further indicated that Wilson needed improvement in the areas of communication and interpersonal skills.

The concerns regarding Wilson's demeanor when she spoke at the 2012 budget meeting were only a small part of her 2012 performance evaluation. In the areas of customer service, technical skills and knowledge, time management, and people management, Wilson's supervisors characterized her performance as meeting expectations and their comments were largely positive. Nevertheless, Wilson complained to Human Resources that her annual evaluation did not reflect her work performance and that Miller retaliated against her for her remarks in the budget meeting. Subsequently, Human Resources revised Wilson's evaluation by changing the performance rating under communication skills from "needs improvement" to "meets expectations" and her performance rating under decision-making/problem-solving from "meets expectations" to "needs improvement."

Wilson alleges that the 2012 performance evaluation had a tangible effect on her employment because it was available to the hiring managers who did not promote her to Director of Recreation Centers and Programs. Citing Altonen v. City of Minneapolis, 487 F.3d 554, 560 (8th Cir. 2007), Wilson argues that the evidence gives

rise to an "inference of retaliatory motive" and that a jury could find a causal link between her speech, the performance evaluation, and the failure to promote her. Nevertheless, like the plaintiff in Altonen, Wilson "points to no evidence in the record that [her] conjecture" contributed to the MPRB's failure to promote her. See id. at 561. "Performance ratings that have a negative impact on promotion potential do not constitute an adverse employment action unless the rating actually led to the denial of the promotion." Turner, 421 F.3d at 696. Wilson does not offer any evidence that the MPRB and Miller would have chosen her as the Director of Recreation Centers and Programs absent the comments in Wilson's December 2012 performance evaluation regarding Wilson's remarks in the budget meeting. See Turner, 421 F.3d at 696 (affirming the district court's grant of summary judgment where the plaintiff failed to show that she would have gotten a promotion absent a negative performance review). In fact, in Wilson's deposition, she asserted that the failure to promote her to Director of Recreation Centers and Programs was because she is "militant" and "arrogant," not because of her speech.

Further, Wilson has not presented any evidence that the performance evaluations were actually used in the promotion decision or that the comments regarding Wilson's protected speech negatively influenced the decision. See Burchett v. Target Corp., 340 F.3d 510, 518-519 (8th Cir. 2003) (holding that plaintiff presented insufficient evidence that a negative performance evaluation resulted in denial of transfer, and "[a] negative performance review is . . . actionable only if the employer subsequently uses that review to alter the terms or conditions of employment to the detriment of the employee"); Thomas v. Corwin, 483 F.3d. 516, 529 (8th Cir. 2007) (affirming district court's grant of summary judgment where there was "no indication the defendants used [plaintiff's] evaluation as a basis to alter detrimentally the terms or conditions of [plaintiff's] employment"). From the record before the Court, no reasonable jury could draw an inference that the MPRB and Miller did not promote Wilson because of comments in her 2012 performance evaluation.

B. Failures to Promote, Suspensions, and Performance Improvement Plan

Wilson further alleges that in retaliation for her protected speech, Miller denied Wilson a promotion and caused Wilson to receive two suspensions, a written reprimand, and led to the imposition of a performance improvement plan. Additionally, Wilson asserts that after the newspaper published Wilson's comments, Miller posted a job opening on the MPRB's website in a hidden fashion, hoping that Wilson would not discover the open position. Miller disputes that Wilson's protected speech played a substantial or motivating role in these employment actions.

In her deposition, Wilson did not testify that the claimed adverse employment actions were in retaliation for her protected speech or that her protected speech was a substantial or motivating factor in the employment decisions. She asserted that the MPRB and Miller reprimanded her and denied her a promotion in retaliation for her reinstatement following a civil service hearing, not acting like a team player, and being "militant" and "arrogant," among other reasons unrelated to the comments at the budget meeting and those published in the newspaper. Thus, the district court found that Miller was entitled to summary judgment.

Wilson argues that the deposition testimony cited by the district court was not specifically tailored to her § 1983 claim because she was also asserting a claim for reprisal pursuant to the Minnesota Human Rights Act. However, Wilson does not offer any evidence, apart from her Complaint and an email she sent to Human Resources Manager Teresa Chaika, to support her contention that her protected speech was a substantial or motivating factor in the claimed adverse employment actions. In her email to Chaika, Wilson alleged that portions of her 2012 performance evaluation were retaliatory. However, as discussed above, a negative performance evaluation does not constitute an adverse employment action unless it causes some tangible effect

on the conditions of employment, which Wilson has failed to demonstrate. Furthermore, at the summary judgment stage, Wilson cannot rely solely upon the bare allegations in her Complaint and her email to Chaika. A plaintiff may not simply cite "unsupported self-serving allegations, but must substantiate [her] allegations with sufficient probative evidence." Reed v. City of St. Charles, Mo., 561 F.3d 788, 790-91 (8th Cir. 2009) (quoting Bass v. SBC Commc'ns, Inc., 418 F.3d 870, 872-73 (8th Cir. 2005)); Thomas, 483 F.3d at 527 ("Mere allegations, unsupported by specific facts or evidence beyond the nonmoving party's own conclusions, are insufficient to withstand a motion for summary judgment."). Moreover, the MPRB and Miller have proffered non-retaliatory reasons for the alleged adverse employment actions, including Wilson's failure to reprimand subordinates appropriately. We need not reach this stage of the analysis however, because Wilson has failed to establish a prima facie case of First Amendment retaliation. Without any evidence in the record probative of Wilson's allegations, no reasonable jury could find that Wilson's speech was a substantial or motivating factor in the claimed adverse employment actions. Accordingly, Miller is entitled to summary judgment.

III.

We review a district court's decision not to exercise supplemental jurisdiction over pendent claims for an abuse of discretion. Williams v. Hobbs, 658 F.3d 842, 852-53 (8th Cir. 2011). A federal district court has discretionary power to decline the exercise of supplemental jurisdiction where the court has "dismissed all claims over which it has original jurisdiction." 28 U.S.C. § 1367(c)(3). The factors a court should consider in determining whether to exercise jurisdiction over pendent state law claims are judicial economy, convenience, fairness, and comity. Carnegie-Mellon Univ. v. Cohill, 484 U.S. 343, 350 (1988). "[I]n the usual case in which all federal-law claims are eliminated before trial, the balance of factors to be considered under the pendent jurisdiction doctrine . . . will point toward declining to exercise jurisdiction over the

remaining state-law claims." Johnson v. City of Shorewood, Minnesota, 360 F.3d 810, 819 (8th Cir. 2004) (quoting Cohill, 484 U.S. at 350 n.7).

Here, all federal claims were dismissed before trial. Wilson points to no factor that distinguishes this case from the usual case. Therefore, the balance of the factors indicates that Wilson's Minnesota Human Rights Act claim properly belongs in state court. See Cohill, 484 U.S. at 350. Accordingly, the district court did not abuse its discretion in declining to exercise supplemental jurisdiction over the state law claims.

IV.

For the foregoing reasons, we affirm the judgment of the district court.

SMITH, Circuit Judge, dissenting.

I respectfully dissent from the majority's holding that no reasonable jury could infer that Wilson's poor performance evaluation was in part a result of her protected speech. At the summary judgment stage, we view the evidence "in the light most favorable to the nonmoving party." *Davison*, 490 F.3d at 654 (quotation and citation omitted). To view the evidence in the light most favorable to Wilson means, in part, that we "give [Wilson] the benefit of all reasonable inferences." *See Dace v. ACF Indus., Inc.*, 722 F.2d 374, 375 (8th Cir. 1983) (citations omitted). Under this standard, a reasonable jury could find that Miller retaliated against Wilson for her protected speech.

As the majority correctly notes, a poor performance evaluation, on its own, does not constitute an adverse employment action. *See Turner*, 421 F.3d at 696. But, a poor performance evaluation does constitute an adverse employment action "where the employer subsequently uses the evaluation as a basis to detrimentally alter the terms or conditions of the recipient's employment." *Id*. (quotation and citation omitted).

-11-

Thus, the classification of Wilson's performance evaluation as an adverse employment action is tied to its use in the decision not to promote her to the Director of Recreation Centers and Programs. If the hiring manager used the performance evaluation as a basis in the hiring decision, it constitutes an adverse employment action.

The majority's conclusion that Wilson failed to "present[] any evidence that the performance evaluation[] w[as] actually used in the promotion decision or that the comments regarding Wilson's protected speech negatively influenced the decision" suffers from a significant defect. The majority draws the conclusion without granting Wilson the benefit of all reasonable inferences. In fact, the majority's conclusion is premised on unfavorable inferences drawn from the facts.

First, the majority finds that the comments on Wilson's 2012 performance evaluation "were consistent with a 2011 performance review." From this, the majority concludes that "[t]he 2011 performance review further indicated that Wilson needed improvement in the areas of communication and interpersonal skills." It is unclear if the majority is saying that Wilson was not promoted because she "needed improvement in the areas of communication and interpersonal skills" or interpreting the "consistency" of the reviews as negating a retaliatory motive. Either is problematic. If the former, the majority has conceded that the 2012 performance evaluation served "as a basis" in the hiring decision. *See id.* If the latter, the majority has unfavorably inferred that the consistency between the 2011 and 2012 performance evaluations is attributable solely to "Wilson's demeanor" rather than independently attributable to Wilson's protected activity.

Next, the majority's conclusion rests on an unfavorable interpretation of Wilson's deposition testimony. In concluding that "Wilson does not offer any evidence that the MPRB and Miller would have chosen her as the Director of Recreation Centers and Programs absent the comments in Wilson's December 2012 performance evaluation," the majority finds that Wilson "asserted that the failure to

-12-

promote her . . . was because she is 'militant' and 'arrogant,' not because of her speech." This is a misreading of Wilson's deposition testimony. At her deposition, counsel for the MPRB and Miller asked Wilson, "what is [the decision not to select you for the position of Director of Recreation Centers and Programs] retaliation for?" The following interchange resulted:

[Wilson.] Again, all of the things that I've already mentioned, the fact that I got my job back, the fact that all—all the things that was—

[Counsel.] The reinstatement?

[Wilson.] The re—the reinstatement, the fact that we went through Civil Service and the things that she indicated.

[Counsel.] The fact that she believed that you signed off on falsification of documents?

[Wilson.] Yes. The fact that I'm militant, the fact that I'm arrogant, all—all of these things were retaliatory in nature . . . .

Wilson's performance evaluations are part of "all of the things that [she had] already mentioned." Earlier in the deposition, counsel asked Wilson if she believed that the 2012 evaluation was retaliation for speaking up at the budget meeting. Wilson responded, "Absolutely." Counsel also asked Wilson how the evaluations affected her ability to receive a promotion. Wilson answered that because of Miller's "input on them," she "was not going to be hired." Moreover, in paragraphs 46 and 49 of Wilson's complaint, she clearly connects the negative performance evaluation that she received in 2012 to her failure to be promoted. The majority's interpretation of Wilson's deposition testimony not only relies on an unfavorable inference—that her demeanor that was perceived as militant and arrogant was disconnected from her raising questions on delicate issues in an open budget meeting—but also is directly contrary to her complaint.

-13-

Whether the performance evaluation was used in the decision not to promote Wilson is a material fact in dispute. In order to establish this fact, at this stage, there need only be evidence from which a jury could reasonably infer such a conclusion. Wilson meets that low bar. As the majority sets out, Wilson received a poor performance evaluation because of her protected speech. The performance evaluation was available to the hiring manager during the hiring process. It is not a stretch to infer that a hiring manager would consult a candidate's performance evaluations in making a hiring decision. After all, part of the purpose of a performance *evaluation* is to make it possible to evaluate an employee's ability to serve the employer, whether in the employee's current position or in a promoted position. This inference is strengthened when it is viewed in the current context—Wilson was one of two finalists for the Director of Recreation Centers and Programs. The separation between two finalists may very well be a recent negative performance evaluation. This point leads to the next. Whether the performance evaluation led to the hiring decision is a question of causation. Questions of causation should be submitted to a jury unless "the question is so free from doubt as to justify taking it from the jury." *Naucke v. City of Park Hills*, 284 F.3d 923, 928 (8th Cir. 2002) (quotation and citation omitted). A reasonable jury could infer that the hiring manager referenced Wilson's performance evaluation in making the hiring decision. This question is not so free from doubt to warrant taking it from the jury.

The majority effectively requires that Wilson establish that the performance evaluation was improperly used in the hiring decision at the summary judgment stage. That is not the law. Such smoking-gun evidence rarely exists. *See U.S. Postal Serv. Bd. of Governors v. Aikens*, 460 U.S. 711, 716 (1983) (noting that "[t]here will seldom be 'eyewitness' testimony as to the employer's mental processes"). For this reason, we have long held that questions of motive and causation are peculiarly suited to resolution by a factfinder. *See, e.g.*, *Krenik v. Cty. of Le Sueur*, 47 F.3d 953, 959 (8th Cir. 1995); *City of Mt. Pleasant, Iowa v. Associated Elec. Coop., Inc.*, 838 F.2d 268,

274 n.5 (8th Cir. 1988); *Keys v. Lutheran Family & Children's Servs. of Mo.*, 668 F.2d 356, 358 (8th Cir. 1981).

Wilson must also prove that her protected speech was a substantial or motivating factor in Miller's decision to take the adverse employment action. *See Davison*, 490 F.3d at 654–55. The performance evaluation contains sufficient evidence to show that Miller based her poor evaluations of Wilson, in part, on Wilson's protected speech. Under the sections "Decision Making and Problem Solving" and "Interpersonal Skills," Miller gave Wilson a rating of "Needs Improvement." In both sections, Miller cited specifically to Wilson's protected speech.

Because Wilson has established a prima facie case of First Amendment retaliation, I respectfully submit that the district court's grant of summary judgment should be reversed and remanded for further proceedings.

_____